E-FILED
Tuesday, 14 April, 2026 01:08:10 PM
Clerk, U.S. District Court, ILCD



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>JASON HELEMS,<br>Defendant. | ) | Criminal No. 1:24-10036 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL M. MIHM and a Jury
EXCERPT FROM JURY TRIAL
MARCH 24, 2026; 8:48 A.M.
PEORIA, ILLINOIS

APPEARANCES:

For the Government: MATTHEW Z. WEIR, ESQUIRE
Asst. United States Attorney
318 South Sixth Street
Springfield, Illinois 62701

MELISSA ORTIZ, ESQUIRE
Asst. United States Attorney
211 Fulton Street, Suite 400
Peoria, Illinois 61602

For the Defendant: SHARBEL A. RANTISI, ESQUIRE
Rantisi Law, LLC
4812 N. Prospect Road
Peoria, Illinois 61616

Jennifer E. Johnson, CSR, RMR, CRR
U.S. District Court Reporter
Central District of Illinois

Proceedings recorded by mechanical stenography; transcript produced by computer

INDEX

PAGE

WITNESS FOR THE GOVERNMENT:

JAMES KEAGAN ROBINSON

DIRECT EXAMINATION 9

(Proceedings held in open court, out of the presence of the jury.)

THE COURT: So we have a motion in limine that was filed last night. I just read it a few minutes ago.

I assume the government has seen it?

MR. WEIR: Yes, Your Honor.

THE COURT: What's your reaction?

MR. WEIR: Your Honor, the government objects on grounds of relevancy. It -- Mr. Reteguin, obviously, is not here. He is not on trial. Proving his guilt or innocence does not affect any of the elements that the jury must decide in this case, so for those reasons we would object to the introduction of that information.

THE COURT: Mr. Rantisi?

MR. RANTISI: Judge, you know, about the fact that he's not here, he's not here because he fled; in other words, it's not because there was a severance or they elected to go forward on Helems first.

Based on the testimony that was elicited yesterday about the statements Reteguin made, I mean, he was pointing the finger at Helems. He said that Helems fled on his own and that Reteguin

just wanted to get out and, *Let me out*.

THE COURT: You brought that up, didn't you?

MR. RANTISI: I did not bring that up. I brought up the duffel bags being thrown out. The government followed up once the ruling on the objection was made, and they elicited that information. And that was intentional on my part; I mean, I was focused on the statements that I elicited.

So now we have evidence that Helems chose to flee and that Reteguin wanted out, and in part I think now it's relevant that Reteguin is the one that has fled this case; he'd otherwise be here.

And, you know, if the government wants to argue consciousness of guilt as to why Helems fled, we think it's relevant that we be able to do the same based on the evidence that's in the case.

And by the way, there's been just kind of comments, of course, that Reteguin's name's come up. They should know -- the jury, that is, should know that he's -- his case -- at a minimum, they should know his case is pending, but beyond that, we think it's fair to point out that he's actually fled this prosecution.

Thank you.

THE COURT: Thank you.

MR. WEIR: Your Honor, I think -- I think that reasoning relies on several assumptions, one being that Mr. Reteguin wouldn't have pled were he still here, and we wouldn't be able to introduce the fact that he pled to the jury because he's not on trial. His guilt is not at issue in this case.

So, again, we do object.

THE COURT: Well, it's an interesting issue. On one hand, it almost suggests that supposedly only one person is guilty, either the person who's not here or the defendant. That's not necessarily so.

But I think there's some merit to what Mr. Rantisi is saying, and so I think it's appropriate for the jury to be informed that the defendant -- the other defendant, that that case is still pending. I'm not going to tell them that he's a fugitive.

Now, the next question is, How do we do that?

I think you have a suggestion, Mr. Rantisi?

MR. RANTISI: Yeah. Mr. Weir and I spoke before court, and I think the discussion is basically that if the Court grants this motion -- which it sounds like you have in part -- that we

would just do it by stipulation.

THE COURT: Oh, okay. Have you got that written out yet?

MR. RANTISI: No, but I'll --

THE COURT: Do that and give it to me, and I'll -- whenever, and I'll read it.

MR. RANTISI: I suppose that's something that we can present during our case in chief.

MR. WEIR: Right, as long as it comes in before we go to the jury, before we --

THE COURT: Yes. I would say the sooner the better.

MR. RANTISI: Okay. I'll do it during the first break --

THE COURT: Whatever.

MR. RANTISI: -- if that's all right.

THE COURT: Yes. That's fine.

MR. RANTISI: Yes, sir. Thank you.

MR. WEIR: Your Honor, I do have one other issue.

THE COURT: Yes.

MR. WEIR: We have a dual witness, a fact witness who will also testify as an expert. Our plan is to put him on as a fact witness, then put on another fact witness, then re-call him as an

expert. According to case law, bifurcating the testimony is the best way to do it. That way there's no confusion over what portion he's testifying to.

We also tendered Jury Instruction 13, which I notified Mr. Clerk of, for the Court to be able to admonish the jury when he -- when it deems appropriate about the dual nature of his testimony and when he is or is not acting as an expert.

THE COURT: All right. What's the Defense position on this?

MR. RANTISI: Judge, that's fine.

THE COURT: I haven't actually done it that way before, but it makes sense.

MR. WEIR: Well, Your Honor, this morning I read *Jett*, and it indicated the best practice is to do it this way, but I've done it where they basically just --

THE COURT: That's fine.

MR. WEIR: -- been at once. Since he's here, we'll just put him on quick.

THE COURT: All right. So I would just tell the jury he's going to be testifying twice, once as a fact witness and secondly as an expert.

MR. WEIR: Right. And that -- I guess that

his expert status has no bearing on his fact witness testimony.

THE COURT: I don't know if it does or not. We'll leave that up to Mr. Rantisi.

Anything else?

Are all the jurors here?

COURT SECURITY OFFICER: I don't think so. Not yet.

THE COURT: Okay. Who's your first witness?

MR. WEIR: It is Keagan Robinson. He's waiting outside.

THE COURT: Okay. Get him in the courtroom. We're ready to go.

COURT SECURITY OFFICER: Last one is coming through security right now.

(A pause was had in the record.)

THE COURT: You can just wait there if you would. Thank you.

COURT SECURITY OFFICER: All jurors are here now.

THE COURT: Okay. Bring them in, please.

(The jury was brought in.)

THE COURT: Good morning. Does any juror have anything to report to me? You've all maintained this wall of silence around yourself?

JURORS: Yes, sir.

THE COURT: Okay. Great.

So, call your next witness, please.

MR. WEIR: Your Honor, the government calls James Keagan Robinson.

THE COURT: Okay. Would you come up here, please? Raise your right hand to be sworn, please.

**(Witness sworn by the clerk.)**

THE COURT: Is this when you want me to do this?

MR. WEIR: I think it -- yes, Your Honor.

THE COURT: Okay. So this witness, Task Force Officer Robinson, he's going to testify right now as a fact witness, and then later he's going to come back and testify as an expert witness concerning certain things. Okay?

Go ahead.

MR. WEIR: Thank you, Your Honor.

**JAMES KEAGAN ROBINSON,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MR. WEIR:

Q. Can you please state your name and spell it for the record?

A. Yes. It's Task Force Officer James Robinson. J-a-m-e-s, R-o-b-i-n-s-o-n.
Q. Who are you a task force officer with?
A. With the DEA.
Q. And what is your actual employment?
A. With the Illinois State Police.
Q. How long have you been employed by the Illinois State Police?
A. Since 2018.
Q. How long have you been a task force officer with the DEA?
A. Since January 1st of 2020.
Q. Prior to that, did you have any other law enforcement experience?
A. Yes. I was a local officer in Menard County, Illinois, and I was on the task force with Menard County, working with the state police task force, though, instead of the DEA task force.
Q. In total, how many years of law enforcement experience do you have?
A. Since 2012, approximately, is when I started in law enforcement.
Q. And on February 11th of 2023, did you become involved in an investigation in the Peoria area?
A. Yes, sir.

Q. How did that happen?
A. I was notified of a possible operation going on in Peoria by other members of the DEA, and I was contacted to go and assist with the operation.
Q. What was your part in that operation?
A. I was surveillance to start off the operation and then basically anything that I was asked to do after that.
Q. And on that day, were you in an undercover capacity?
A. Yes, sir.
Q. What does that mean?
A. That means I was wearing plainclothes, and I was driving an unmarked vehicle. I wasn't in a trooper squad car or in a marked unit of any kind.
Q. When you got to Peoria, what actual role did you start out playing in this investigation?
A. I helped with the surveillance of any possible vehicles that we were trying to identify based on the information we had received and helped just kind of navigate the area for the other members of the team who weren't as familiar with Peoria.
Q. Was there any particular place that you conducted the bulk of your investigation -- or your surveillance? I'm sorry.

A. Yes. I would say the Bass Pro Shop and the Wal-Mart that are in the East Peoria area.
Q. And how did you conduct surveillance out there?
A. We had identified a possible vehicle that we believed could be the truck tractor that we were looking for in this case, and when the vehicle entered the parking lot, I would enter the parking lot, basically pretending to be a customer, and parking and just trying to stay in my vehicle and blend in with the other people in the parking lot so I could watch what that vehicle was doing.
Q. So while you were out there at Bass Pro and Wal-Mart, did you see the suspect's semi?
A. Yes.
Q. And do you remember approximately how long that semi was out there at Bass Pro or Wal-Mart?
A. I don't remember exactly how long. I remember it was at Bass Pro for what felt like an extended amount of time and then the Wal-Mart for a little bit shorter duration. Maybe, maybe an hour or less at Bass Pro and then a little bit shorter time at Wal-Mart. But I don't remember exactly the timeline.
Q. And at some point did officers receive

information that that semi was leaving that area and relocating somewhere else?
A. Yes. We were watching it, and we had seen the driver in and out the semi, and the driver had not met with anyone at this point, and we were expecting that to happen. And so we waited.
And then once the vehicle started to leave, we let surveillance units in the area know so that way we're not all following the vehicle out at the same time and making it look obvious that he's being followed.
Q. Now, where did that vehicle move to?
A. It moved to Lowe's parking lot in Peoria.
Q. Now, were you part of the surveillance in that Lowe's parking lot?
A. I did not go into the Lowe's parking lot. I was -- I just remained in the area. I could not see directly what was going on. I was just listening on the radio. Other people were in the Lowe's parking lot.
Q. Why didn't you go into the Lowe's parking lot?
A. I had already been at Bass Pro and at the Wal-Mart, and I was within eyesight of the truck and the driver so I didn't want to have him see the same vehicle in three places in a short amount of

time, if he may be looking for people who are following him.
Q. Now, at some point did information go out that a meeting had happened?
A. Yes.
Q. Did you respond to any of the information about the suspect vehicle after it had met with the semi?
A. How do you mean? Sorry.
Q. That was a bad question. Let me back up.
Did you receive information that a suspect vehicle had met with the semi?
A. Yes.
Q. Did you receive information that that vehicle then left the area?
A. Yes.
Q. Were you involved in any way in following that suspect vehicle?
A. Yes. The -- we had live-time information from the people who were in the Lowe's parking lot that a suspect truck had showed up to meet with the truck tractor semi. The -- there was a short meeting that occurred. They described what they saw was bags going out of the truck tractor semi into the -- it was a --

MR. RANTISI: Objection, hearsay.

MR. WEIR: Your Honor, I believe the testimony is what he received and where he responded to at that time.

THE COURT: The objection's overruled.

A. So they were describing that bags were coming out of the truck tractor semi and going into the Ford F-150 that was in the Lowe's parking lot next to the truck tractor semi-trailer.

Then the Ford F-150 left the parking lot, and surveillance units followed the Ford F-150 away from the Lowe's parking lot.

They followed the vehicle away for a short distance to try and get some space between the truck tractor semi and the Ford F-150 in order to make a traffic stop, but not close enough that the truck tractor semi might see that the Ford F-150 had been traffic-stopped.

Then I was getting this information on the radio. I was not following directly because I had been so close to the truck tractor semi already. I was trying to kind of keep my distance from both suspect vehicles at this point.

And someone from Peoria Police initiated a traffic stop on the vehicle. We were told on the

radio then that the vehicle was not stopping for the traffic stop; the vehicle was fleeing from the stop at a high rate of speed.

So at that point, when you're surveillance, you're just trying to kind of trail behind the suspect vehicle's wake, just in case they crash or, you know, there's some other type of incident that happens -- you know, another vehicle crashes because they're trying to avoid that one -- and also to try and eventually catch the suspect vehicle and the driver.

Eventually, I was told that the suspects -- two suspects in the suspect vehicle were in custody.

I met with Task Force Officer Stolz who informed me that he had found a bag on the side of the road.

MR. RANTISI: Objection, hearsay.

THE COURT: Sustained as to that.

BY MR. WEIR:

Q. All right. Did you meet with TFO Stolz based on information you received about his location?

A. Yes.

Q. And what did you see when you arrived there?

A. A duffel bag on the side of the road.

Q. And did you and TFO Stolz take that evidence into custody?
A. Yes.
Q. Was it transported back to the Peoria Police Department?
A. That's correct. I photographed the bag in its place, and then we collected it and took it.
Q. Back at the Peoria Police Department, did you take pictures of evidence that had been gathered?
A. Yes.
Q. Did that include the evidence from Officer Stolz?
A. Yes.
Q. Did it also include other evidence that other officers had gathered?
A. That's correct.
Q. And then at some point did you also search the Ford F-150 that had fled from the police?
A. Yes.
Q. And when you did all of that, did you take pictures?
A. Yes.
MR. WEIR: Your Honor, I would move to publish Government's Group Exhibit 11.
THE COURT: Okay.

MR. RANTISI: No objection.
THE COURT: Lights down, please. Thank you.
BY MR. WEIR:
Q. Agent Robinson, this is page 1 of 8.
Do you recognize that picture?
A. Yes.
Q. Is that a picture you took?
A. That's correct.
Q. And what does that picture depict?
A. That is one of the duffel bags with the kilograms removed from the duffel bag and laid out on our evidence table in Peoria PD.
Q. And so did all of those packages on the right there, those nine packages come out of that duffel bag?
A. Yes.
Q. When you found that duffel bag, were they all inside of it?
A. Yes.
MR. WEIR: Can we move to the next one, please.
Q. Is that another picture you took, sir?
A. Yes.
Q. And what is that a picture of?
A. That is one of the duffel bags with all of the

kilograms inside of it.
Q. Now, you didn't see this bag where it was collected, correct?
A. Correct.
MR. WEIR: Can we move on to the next, please.
Q. What's that a picture of, sir?
A. That's one of the duffel bags that was found, again with the kilograms inside of it, though, instead of outside of it.
Q. And again, you weren't present when that was actually found by police, correct?
A. Correct.
MR. WEIR: Can we move to page 4, please.
Q. And is that just another picture of the contents of that first duffel bag?
A. Yeah. Everything looks very similar as far as the kilograms inside the bags, but that's one of the -- a close-up shot of some of the kilograms.
Q. And do you notice any markings on those?
A. Yeah, there's letters and numbers on them.
MR. WEIR: Can we move to the next picture, please.
Q. And what is this a picture of?
A. That is the -- all of the kilograms from the different bags removed from the bags, though, with

the bags placed behind the kilograms. You can kind of see them behind it.

Q. Now, if you start on the right side of that picture, can you see a marking that looks like KF 22 on it?

A. Yes.

Q. And then if you look at the other two kind of stacks of these packages, in the middle, can you see a marking that looks like Fox 7 or Fox?

A. Yes.

Q. And so these kilograms are lined up with the bags they came out of. Is that accurate?

A. Yes.

MR. WEIR: Can we move on to picture number 6, please.

Q. And sir, what is that a picture of?

A. That is a picture of the license plate from the F-150.

MR. WEIR: And next, please.

Q. What is that a picture of?

A. That is a small statue of Santa Muerte, which is -- that was found in the truck.

Q. Now, by the time you took this picture, someone else had been in the truck, correct?

A. Correct.

Q. So you -- do you know where this statue was when the actual truck was taken?

A. No, I do not know the exact location of it directly after the traffic stop because other people had moved the truck, and there's an initial search that would have happened of the truck.

MR. WEIR: And then finally, if we could go to the next page.

Q. Sir, what's that a picture of?

A. That was a checkbook that has Jason Helems's name on the checkbook that was found inside the truck.

MR. WEIR: We can take that down.

Q. So, I believe that your testimony was that you never actually went to where the arrest happened, right?

A. Correct.

Q. And so you didn't see the two individuals from the truck out there at any time?

A. No.

Q. Were you working this case in collaboration with any other agency -- or, I'm sorry. Strike that question.

Was an agency from out of the area also involved in this case?

A. Yes. There were DEA agents from Chicago who were assisting with this specifically on this day.
Q. And in your capacity with the local DEA, did you meet with them?
A. Yes.
Q. And did you and those agents discuss how to proceed with this investigation?
A. Yes.
Q. And what was the determination that you came to as far as Mr. Helems?
A. As far as this investigation, we knew that Mr. Helems was associated with the group that we were investigating, and we believed in order to protect the bigger investigation that was ongoing in the Peoria area and Chicagoland area that we were going to attempt to do interviews. And then we were going to release the suspects that night.
MR. RANTISI: Your Honor, may we have a sidebar?
THE COURT: Yes.
(Whereupon, the following occurred outside the hearing of the jury.)
THE COURT: Yes.
MR. RANTISI: Your Honor, I don't have any discovery that would support the statement that he

just made that Mr. Helems was associated with this group. That is completely off-guard and has not been provided to me.

THE COURT: All right.

MR. WEIR: Your Honor, I believe that on cross he would be able to inquire into that.

THE COURT: Well, the question is --

MR. WEIR: We have provided that --

THE COURT: Stop. Just a moment. The question is, Did you provide him with discovery that indicated that?

MR. WEIR: The only discovery that we provided him with that would indicate that was one proffer report from someone who mentioned an individual that they suspected was Jason Helems. And that was the only discovery we had that contained that information.

THE COURT: Okay.

MR. RANTISI: I move for a mistrial.

(Whereupon, the following occurred inside the hearing of the jury.)

THE COURT: I'm going to have to ask the jury to go to the jury room, please. Don't discuss this case.

(Whereupon, the jury departed the courtroom.)

MR. RANTISI: Your Honor, is the witness to be excused while this is happening?

THE COURT: Well, I don't see why he has to be. We're talking about something that's already happened.

MR. RANTISI: Yes, sir.

THE COURT: Jennifer, would you read back the last answer, please?

COURT REPORTER: As far as this investigation, we knew that Mr. Helems was associated with the group that we were investigating, and we believed in order to protect the bigger investigation that was ongoing in the Peoria area and Chicagoland area that we were going to attempt to do interviews. And then we were going to release the suspects that night.

THE COURT: All right. Thank you.

So, Mr. Rantisi, he's saying -- the witness said we knew he was associated with a group under investigation.

You're saying you did not receive any discovery that indicated that?

MR. RANTISI: That's correct. There was one proffer report that was so vague, and as Mr. Weir just summarized for you in the sidebar, it said his

name almost in passing, Mr. Helems's name in passing.

What this witness just testified to is completely different and flies in the face of all the testimony we've heard the last day and a half where nobody knew where this was coming. Nobody -- all these other witnesses have said that, that the investigation had no idea who the drugs were being delivered to.

This is a huge deal, and the solution is not for me to try to parse this out on cross-examination in front of the jury when I have no idea what the answers are going to be.

THE COURT: What's the response?

MR. WEIR: Your Honor, the government, frankly, is not aware of the basis of this knowledge from the witness.

I would agree with Mr. Rantisi that nothing in the discovery indicated direct knowledge of Mr. Helems's involvement. It would have been information gathered as part of a larger investigation. There were no, for example, Your Honor, buys or surveillance or anything that I'm aware of of Mr. Helems.

MR. RANTISI: Judge, can I make another point?

THE COURT: Yes.

MR. RANTISI: I've been complaining for the last ten days or so through the different motions we've had that this case lacks corroboration, and now all of a sudden their expert is sitting on information. Their person they're going to submit as an expert here in about 30 minutes has information that does corroborate supposedly that Mr. Helems is involved with these people. That's completely unfair. It's completely prejudicial.

We move for a mistrial.

THE COURT: I was wondering perhaps if we ask the witness to take the stand again and ask -- have him asked what the source of that information was, it might be helpful.

MR. RANTISI: I'm sure he's going to have an answer, but I don't -- that's not fair to us. We should have this --

THE COURT: Well, the jury's not hearing it.

MR. RANTISI: Oh, you want to do it outside the presence -- I misunderstood. I apologize.

THE COURT: Yes. Yes.

Would you come back up, please?

MR. RANTISI: Sorry, Judge.

THE COURT: Sir, you testified that at some

point that you knew he was associated with a group. What did you mean by that?

THE WITNESS: Yes. To clear it up, at the initiation of this day -- of this day that we're speaking of, the Chicago group contacted us and advised us that there was a suspected amount of cocaine that was coming into Peoria to be delivered to an unknown person and/or group. We suspected that a group that we had already been investigating would be the recipient of that cocaine.

Whenever we then went through with following the truck tractor, seeing the meeting, conducting the traffic stop, catching the suspects who fled, and then getting them into our custody, sitting down, discussing the investigation, after gaining all that information, all of the local officers and people who were there then knew that Mr. Helems was associated with the group that we were investigating.

So, it was as we suspected. The people who came to pick up the cocaine was a group we were already investigating. So, this was something that we had prior knowledge of these people. We just did not know until we confirmed it with the pick-up that day of their relation to the Chicago case.

MR. RANTISI: I don't think that changes anything.

THE COURT: No, I don't either.

Do either of you have further questions for the witness before I excuse him?

If not, thank you.

MR. WEIR: No, Your Honor.

MR. RANTISI: Well, can I just -- let me -- if I can have a second?

THE COURT: Yes. Okay.

MR. RANTISI: So, you're telling us that prior to Helems being taken into custody -- strike that.

Prior to his car being followed and maybe the tags run, you guys had information that it was going to be Helems and this group?

THE WITNESS: We had information that we believed someone who was coming to pick up a large amount of cocaine from a truck tractor semi-trailer in the Peoria area would be one of maybe two possible groups in Peoria, one of them being the Reteguin family, and then a couple other potential people who would be picking up that large of an amount of cocaine. And we knew Mr. Helems to be associated with the Reteguin family.

MR. RANTISI: No further questions.

THE COURT: Okay. I want to take a short recess. I need to think about this.

COURTROOM DEPUTY: Court's in recess.

THE COURT: Let's say ten minutes.

(Recess at 9:25 to 9:38 a.m.)

THE COURT: Where are we? What's happening?

MR. RANTISI: Mr. Weir?

MR. WEIR: Well, Your Honor, I believe it's Mr. Rantisi's motion for a mistrial.

At this time, the government does not object.

THE COURT: Mistrial?

MR. WEIR: Yes, Your Honor.

THE COURT: Yes. Well, you anticipated me.

MR. RANTISI: Yes. Thank you, Judge.

THE COURT: I do want to make a short record here, but -- and I'm not really -- I'm not blaming the witness, but it's certainly been clear to the Court and, I think, everybody else that the whole tenor of the defense in this case was the mere presence, didn't know what was happening and all that, and then the witness says that they were aware that he was, in fact, affiliated with some drug-related group.

I could say to the jury, "Disregard that," but this is the whole foundation of his defense, and

that bell has been rung, and I don't think there's any way to unring it.

So, I'm going to grant the motion.

MR. WEIR: Your Honor, if I may, just to clarify the government's position, I do not believe that it was intentional in any way, and I don't believe that it was untrue. I think the basis of his knowledge is insufficient.

THE COURT: Okay. Well, in any event -- so, we need a new trial date.

That middle week in April, Dan, the 15th is on a Wednesday. What's the Monday?

COURTROOM DEPUTY: 13th.

THE COURT: Is it possible we could do it then?

MR. RANTISI: Judge, I have a one-week trial in Urbana. It's a white-collar case; it's a lot of documents. It's at the end of April. That would be really difficult for me to have a trial two weeks before that.

MR. WEIR: Your Honor, the government will defer to Mr. Rantisi's availability. We're around.

THE COURT: When would you like to do it? Take a look at your calendar.

Meaghan, would you run in and get my iPad?

Just bring it out on the stand that it's on, please.

While she's doing that and he's looking, I don't see any need to bring the jury back into the courtroom. With your permission, I would simply go and talk to them in the jury room and excuse them.

Is that agreeable to both sides?

MR. RANTISI: Yes, Judge.

MR. WEIR: Yes, Your Honor.

MR. RANTISI: Judge, I hate to make this request, but with these two schedules, everything got pushed to May, so my May is very busy, and it's very difficult to move some of these cases sometimes.

Can we go to the week of June 1st?

COURTROOM DEPUTY: There's nothing set.

THE COURT: I'm supposed to be in Lithuania.

MR. RANTISI: Well, how about after that?

THE COURT: I'm not sure I'm going but -- thank you, Meaghan.

I could start it on the 9th of June. Would that work?

MR. RANTISI: Yes, Judge.

THE COURT: That's a Tuesday.

MR. WEIR: I'm sorry, Your Honor, what was

that date?

THE COURT: Tuesday, June 9th.

MR. WEIR: That should be fine, Your Honor. Thank you.

THE COURT: And do we need a pretrial conference before that?

MR. RANTISI: I wouldn't think so.

THE COURT: I wouldn't either, but if the need arises, just let me know, and we'll schedule it.

MR. RANTISI: Yes, sir.

THE COURT: Anything else?

MR. RANTISI: No, sir.

MR. WEIR: No, Your Honor.

THE COURT: All right. Thank you.

MR. RANTISI: Thank you.

COURTROOM DEPUTY: Court's adjourned.

(A pause was had in the record from 9:45 to 10:03 a.m.)

THE COURT: Is there something about exhibits?

MR. WEIR: Yes, Your Honor. The government's making a motion that the Government Exhibits 2, 5 and 6 that were entered into evidence in this case -- oh, I'm sorry, all of the exhibits entered into evidence in this case be ordered returned to the custody of the Drug Enforcement Administration at

this time.

THE COURT: I assume there's no objection?

MR. RANTISI: No objection, Judge.

THE COURT: All right. It's granted.

Anything else?

MR. WEIR: No, sir.

THE COURT: All right. Thank you.

COURTROOM DEPUTY: Court's adjourned.

(Proceedings concluded at 10:04 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jennifer E. Johnson, CSR, RMR, CBC, CRR, in and for the United States District Court for the Central District of Illinois, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of March, 2026.

/s/ Jennifer E. Johnson
JENNIFER E. JOHNSON
CSR, RMR, CBC, CRR
License #084-003039