E-FILED
Wednesday, 17 June, 2026 11:14:35 AM
Clerk, U.S. District Court, ILCD


UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, )
Plaintiff, )
vs. ) Criminal No. 1:24-10036
JASON HELEMS, et al., )
Defendants. )

TRANSCRIPT OF PROCEEDINGS - VOLUME I
BEFORE THE HONORABLE MICHAEL M. MIHM and a Jury
EXCERPT FROM JURY TRIAL
JUNE 9, 2026; 8:44 A.M.
PEORIA, ILLINOIS

APPEARANCES:

For the Government: MATTHEW Z. WEIR, ESQUIRE
Asst. United States Attorney
318 South Sixth Street
Springfield, Illinois 62701

MELISSA ORTIZ, ESQUIRE
Asst. United States Attorney
211 Fulton Street, Suite 400
Peoria, Illinois 61602

For the Defendant: SHARBEL A. RANTISI, ESQUIRE
Rantisi Law, LLC
4812 N. Prospect Road
Peoria, Illinois 61616

Jennifer E. Johnson, CSR, RMR, CRR
U.S. District Court Reporter
Central District of Illinois

Proceedings recorded by mechanical stenography; transcript produced by computer

INDEX


| | PAGE |
|---|---|
| PRELIMINARY JURY INSTRUCTIONS | 22 |
| OPENING STATEMENT BY THE GOVERNMENT | 29 |
| OPENING STATEMENT BY THE DEFENSE | 32 |
| WITNESSES FOR THE GOVERNMENT: | |
| CODY WILSON | |
| DIRECT EXAMINATION | 36 |
| CROSS-EXAMINATION | 51 |
| REDIRECT EXAMINATION | 55 |
| MARCUS EDER | |
| DIRECT EXAMINATION | 58 |
| CROSS-EXAMINATION | 71 |
| BRIAN MOORE | |
| DIRECT EXAMINATION | 80 |
| CROSS-EXAMINATION | 93 |
| REDIRECT EXAMINATION | 96 |
| JEFFREY STOLZ | |
| DIRECT EXAMINATION | 97 |
| CROSS-EXAMINATION | 109 |
| REDIRECT EXAMINATION | 118 |
| RECROSS-EXAMINATION | 120 |
| ALBERT HOLOCKER | |
| DIRECT EXAMINATION | 121 |
| CROSS-EXAMINATION | 140 |

INDEX

GOVERNMENT'S EXHIBITS:

(All exhibits pre-admitted)


| | PAGE |
|---|---|
| EXHIBIT 1 | 63 |
| EXHIBIT 1A | 63 |
| EXHIBIT 3 | 105 |
| EXHIBIT 2 | 108 |
| EXHIBIT 4 | 127 |
| EXHIBIT 4A | 128 |
| EXHIBIT 4B | 130 |
| EXHIBIT 7 | 135 |
| EXHIBIT 5 | 137 |
| EXHIBIT 6 | 137 |
| EXHIBIT 8 | 138 |

(Proceedings held in open court, out of the presence of the venire.)

THE COURT: Good morning.

MR. RANTISI: Good morning.

THE COURT: This is the case of the United States of America v. Jason Helems, Criminal Number 24-10036. The defendant is in court represented by his attorney, Sharbel Rantisi. The United States is represented by Matthew Weir and Melissa Ortiz. And we also have paralegal Lisa Hopps and DEA Agent Amanda Petersen at the government's table.

I've got a list of things that we need to talk about briefly, and then you may have some matters of your own to bring to my attention.

The first thing is I would -- I'd like you to remind me. There are two defendants named in the indictment, and the other -- the co-defendant is a fugitive. I noticed in the government's latest version of their jury instructions, they present the indictment in two forms. One of those forms only has one defendant named.

Is that -- was that your intention there?

MR. WEIR: Your Honor, no, ours would be --

THE COURT: Be seated.

MR. WEIR: I'm sorry; that's correct.

They're both a version of the same one. We intend to use the one with both defendants.

THE COURT: All right. So I'd like counsel to remind me, I think I said something to the jury, but I don't remember what.

What did I say to them?

MR. RANTISI: Judge, as far as a statement of the case, you just read the indictment with both defendants listed.

THE COURT: Yeah.

MR. RANTISI: And then we had a motion in limine where we were asking the Court to allow us to bring up the fact that he's a fugitive. You declined to allow that, but you approved us to state that Mr. Reteguin's case is pending.

THE COURT: Oh.

MR. RANTISI: And the solution to that is a stipulation that the parties have agreed on.

THE COURT: Oh, great. Can you give it to me?

MR. RANTISI: It's downstairs. Do you want me to -- it's very simple. It just says, Defendant Edu Reteguin's case is still pending.

THE COURT: All right. Just get that to me before we start jury selection.

I assume that's appropriate?

MR. WEIR: Yes, Your Honor.

THE COURT: Great. All right.

So voir dire, nobody submitted any new questions. The last time Defense Counsel offered three or four, and I think I approved all of them in one form or another.

Is that correct? There's no objection?

MR. WEIR: Your Honor, we did have an objection the first time, and the Court sustained it. It was just the language about putting them on -- there was some language in one of the Defense proposed questions about putting them on a higher footing or better footing, and the Court said you would give that question without that wording and that's --

THE COURT: Yeah, I have my own wording that I use for that, but it, it will be covered, let me put it that way.

Anything else on voir dire?

MR. WEIR: Not for the government, Your Honor.

THE COURT: Okay. The witness list is the same?

MR. WEIR: Yes, Your Honor.

MR. RANTISI: Yes, Judge.

THE COURT: Okay. Opening statements, I think

we talked -- certainly no problem the first time. 10 or 15 minutes?

MR. RANTISI: Correct.

THE COURT: Neither side is using any visuals during opening statement; is that correct?

MR. WEIR: No, Your Honor.

MR. RANTISI: That's correct.

THE COURT: Okay. Great.

I have a new exhibit, exhibit list.

MR. WEIR: Your Honor, we do have a final-final version of that, if you would, Your Honor, just filed with the Court this morning that's been approved by both parties.

If I may approach?

THE COURT: Sure. And, Mr. Rantisi, any surprises on there?

MR. RANTISI: No. They're all the same. We added a couple more.

THE COURT: Oh, okay. Well, I'm not going to read this to the jury.

Okay. And we had agreed the last time that when we get to jury deliberations that the exhibits are going to be presented to them digitally, correct?

MR. RANTISI: Correct. We are prepared to do

that.

THE COURT: Okay. In terms of the method of jury selection, I don't need to remind you of this, but I will. So, the jury's downstairs. It's a brand-new jury; they haven't been here for any other trial. I'll be going down there in a few minutes to do an orientation, and then we'll come back up. Hopefully we'll be able to get started before 9:30.

So they're going to shuffle the cards up downstairs, so when they come in the jury room -- or when they come in here, the first 12 jurors through the door are going to be the first 12 so --

And did you give them sheets to use for --

COURTROOM DEPUTY: They have all the questionnaires. I'm making the sheet now.

THE COURT: Okay. Great.

So they'll be sworn in. I'll introduce the case to them. I'll tell them that the trial is expected to last two to three days. Are we still thinking that maybe this would go to the jury on day two?

MR. RANTISI: I think so.

MR. WEIR: It's possible, yes.

THE COURT: Okay. But in any event, I want

that extra day in there in case they need time to deliberate. So, two to three days. I will read the indictment to them, and then I'll introduce each of you. When I introduce you, please stand and face the jury. Then I'll read the list of potential witnesses. And then I have some boilerplate introductory stuff that I do, and then we'll go to their -- we'll go to their questionnaires which, I believe, you have on the table, correct?

MR. RANTISI: Correct.

THE COURT: Because this is a criminal case, it's very common to have jurors come over to the sidebar because they've indicated in the questionnaire that someone in the family has been arrested or prosecuted or convicted, and I think we always like to follow up with that -- where it happened, when, all of that -- and I don't like to do that in front of the other jurors so we bring them over to the sidebar. I will ask them whatever questions I feel are appropriate, and at the sidebar I'll let you ask questions directly to the juror but only dealing with what brought us to the sidebar. Okay?

It's very common to need to excuse a juror for

cause. That's almost always obvious, and I just do it. If you conclude that someone needs to be excused for cause and I'm not getting it, ask for a sidebar at that time. So don't leave it until later. If a juror is excused, we'll fill in the empty chair and bring that juror up to speed.

When I've completed all of my questions, at the end of the round, I'll ask you if you have any additional questions you want me to consider, and if there are, I will consider them and either ask them or not. And then I'll give you seven or eight minutes to look at your notes, look at the questionnaires. And then in round one, the government will make any peremptory challenges that you wish. Write them down, hand that to the Defense table. You will add any ones that you want. Give it to the clerk. I'll excuse those jurors. And then we'll fill in the blanks and go into round two.

There's no back-striking. If you pass over a juror in one round, you cannot strike them in a later round.

In round two, we'll follow the same process, except in round two the Defense will go first with your strikes.

The government has six strikes; the defense has ten. Once we have the jury of 12, we'll call four new jurors up front. We'll go through the same process with them, and then the government will strike one, the defense will strike one, and that will leave two jurors, and those two jurors will be the alternates in the order in which they were called forward.

Is that process agreeable to everyone?

MR. WEIR: Yes, Your Honor.

MR. RANTISI: Yes, Judge.

THE COURT: I noticed in looking at the exhibit list there are multiple references to different excerpts from this or that.

I assume, Mr. Rantisi, you've been fully informed as to all of those?

MR. RANTISI: Yes, Judge.

THE COURT: Are there any objections to any of the exhibits?

MR. WEIR: Your Honor, yes, the government does object to Exhibit F, Defense Exhibit F. It would be on relevancy grounds, Your Honor.

THE COURT: Hold on. Let me see. I don't see that. I don't know if I have -- do I have -- I think this is the up-to-date. I don't see any "F"

on here to begin with.

MR. WEIR: Is that the one I just handed up?

THE COURT: Well, you handed me a witness list, didn't you? This is witness.

MR. WEIR: Oh. Well, then I gave you the wrong thing. My apologies, Your Honor. Swap this out with that. I gave you the wrong --

THE COURT: And by the way, I had a question anyway, just curiosity. Pictures of the defendant in different -- at different times. The government is offering that?

MR. RANTISI: No, those are the defendant's exhibits.

THE COURT: I see.

MR. RANTISI: Page two are all Defendant's, A through F.

THE COURT: I see. Okay.

Okay. So, Mr. Rantisi, the WhatsApp messages, tell me about those.

MR. RANTISI: Your Honor, the -- one of the agents in this case, Jeffrey Stolz, submitted an application for a search warrant that was signed by Judge Hawley. It was for the contents of the blue Motorola phone that Mr. Reteguin tried to break in half prior to his arrest and that was dropped on

the ground. It's visible from the surveillance camera footage.

The search warrant was sent to Motorola, and the WhatsApp messages are the responses from Motorola, and it has to do with text messages and phone calls that took place on the same date and around the same time as this whole incident.

THE COURT: Can I see those? Do you have a -- an exhibit -- or your number F?

MR. RANTISI: They're downstairs. I didn't bring up my tote yet.

THE COURT: Well, I will need to look at them before -- do you have a copy?

MR. WEIR: I do, Your Honor.

If I may approach?

THE COURT: Thank you.

There's quite a few of them. Are you intending to offer all of them that are in the exhibit?

MR. RANTISI: Yes. I intend to ask Jeff Stolz about it and see if he followed up on anything, which I think he didn't.

THE COURT: So you have missed calls, outgoing calls. Looks like a lot -- most of them are calls, aren't they?

MR. RANTISI: Yes.

THE COURT: Is there a difference between the blue and the green?

MR. RANTISI: Might have to ask him about that.

THE COURT: Oh, okay. These are all around the time of the incident?

MR. RANTISI: That's right, Judge. If you look at the time, I think it says UTC which we learned last time is a five- or six-hour difference from Central Standard Time.

THE COURT: Uh-huh.

MR. RANTISI: So if you do the math backwards to Central Standard Time, you'll find that it's all around that, you know, late afternoon, early evening of February 11th.

THE COURT: So just quickly looking through here, it looks like there are only two or three messages. The rest of them are phone calls.

MR. RANTISI: Yeah.

THE COURT: Just reports the fact of a phone call.

MR. RANTISI: Correct.

THE COURT: Okay. And what's the objection to this?

MR. WEIR: Your Honor, it's both on relevance grounds as well as the few messages that do have content are in Spanish and untranslated which they would be irrelevant to the jury on that ground, and if they're not --

THE COURT: Well, you know -- let me start with this. You've had somebody translate them; you know what they say.

MR. WEIR: No, we have not, Your Honor.

THE COURT: I'm sorry?

MR. WEIR: We have not, Your Honor.

THE COURT: I'm shocked.

MR. RANTISI: Yeah.

THE COURT: You're a trial lawyer here. I assume you would want to know what they say.

MR. RANTISI: Makes two of us.

MR. WEIR: They -- the phone was reviewed, and nothing of any substance was found during our review, Your Honor.

THE COURT: All right. Well, at this point, I'm going to let them in over objection.

Is your client going to testify, or does he know yet?

MR. RANTISI: He plans on testifying.

THE COURT: All right.

MR. RANTISI: And I plan on mentioning that in opening.

THE COURT: Okay. Don't let me forget, after the government rests, before you present your evidence, that I have a dialogue with him about that.

MR. RANTISI: Yes, sir.

THE COURT: All right. Anything else?

MR. WEIR: No, Your Honor.

MR. RANTISI: No, Your Honor.

THE COURT: All right. I think our jurors are here, right?

So we're going to be in recess for about 15 minutes. Don't go too far. I'll go down and do the orientation, and then we'll get started.

Anything from either side before we recess?

MR. RANTISI: No, sir.

MR. WEIR: No, Your Honor.

THE COURT: Okay. I'll be back.

COURTROOM DEPUTY: Court's in recess.

(Recess at 9:02 to 9:18 a.m.)

THE COURT: So we have 38 jurors which should be enough.

Could you move that flat screen over against the wall so it's not blocking the audience, please?

Thank you.

And you folks back in the audience, would you move over to the left side? So we've got all those jurors that were downstairs need a place to sit.

Would you folks move over, too?

GALLERY MEMBER: Us?

THE COURT: Everybody. Thank you. After jury selection, you can sit wherever you'd like to sit.

Do you think we have enough seating?

COURTROOM DEPUTY: We'll have 12 in the box so there should be enough.

THE COURT: That's right.

All right. Bring them up.

So it looks like we've got some stipulations, correct?

MR. WEIR: Yes, Your Honor.

MR. RANTISI: Yes, Judge.

THE COURT: And you will need to tell me when you want me to read these, okay?

MR. RANTISI: Yes, sir.

THE COURT: Mr. Rantisi, have you carefully gone over the subject matter of these with your client?

MR. RANTISI: Yeah, we did last time. Can't say I did it this round, but we did last time, and

you inquired of him last time if he was aware.

THE COURT: Mr. Helems, you're aware that this basically is normally a substitute for someone taking the stand and testifying. You understand that?

(Defense counsel and the defendant conferred off the record.)

THE DEFENDANT: Yes.

THE COURT: Okay. So, it typically means that the parties agree that something is true or that if someone was called to testify, they would testify in a certain way.

THE DEFENDANT: Yes.

THE COURT: Okay. And you agree to that?

THE DEFENDANT: Yes.

THE COURT: Okay. Fine.

Are they out there?

COURTROOM DEPUTY: They're on their way.

THE COURT: Okay. And traditionally, everyone stands when the jury comes in.

(A pause was had in the record.)

THE COURT: Dan, if there's not enough room back there for them, they could sit right next to where you're standing, if necessary.

(A pause was had in the record.)

(Venire entered the courtroom; 9:23 a.m.)

* * * * *

(Venire sworn.)

(Voir dire conducted.)

(Jury sworn.)

* * * * *

THE COURT: Have a seat.

[redacted], you're the only juror who wasn't called forward. This would either be a very good or very bad day to buy a lottery ticket.

JUROR NO. 83: I'll go buy a lottery ticket.

THE COURT: Anyway, thank you so much for your service. Call in Wednesday after 3. Okay?

JUROR NO. 83: Okay. Thank you.

THE COURT: And I promised you downstairs that the selection of the jury would take place by noon, and barely made it, but we did.

So, we're going to stop for lunch. When you come back, I'll have some preliminary instructions of law for you, and then we'll have opening statements and get into the evidence. Okay?

So we're going to start again at 1:15. That's, I believe, plenty of time to get lunch. If you're not sure about where, Dan can give you some ideas.

Do you want to take them down to the jury room so they know where it is?

He's going to take you to the jury room, and then when you come back from lunch, go directly to the jury room.

Over the noon hour, please do not discuss the case or let anyone discuss it with you.

Also, you may run into one or more of these people because they have to eat, too. You cannot have a conversation with them. They will not make any attempt to acknowledge you at all, for various reasons. If someone saw you talking with one of them, it could have been completely innocent, but it would still look bad. So please don't do that.

Have a nice lunch. We'll see you at 1:15.

(Whereupon, the jury departed the courtroom.)

THE COURT: So we're ready to go at 1:15, counsel? 1:15?

MR. RANTISI: Yes, Judge.

MS. ORTIZ: Yes, Your Honor.

(Recess at 11:57 a.m. to 1:17 p.m.)

(Proceedings held in open court, out of the presence of the jury.)

THE COURT: A couple things. I think maybe we talked about this before the first trial, but all

but one of the exhibits there was no objection, and I've ruled on the one where there was, so can we admit all the exhibits and maybe cut out the need for some of the foundational stuff? I'm not saying you can't do the foundation; I'm just saying you don't have to.

Are we agreed on that?

MR. WEIR: That's fine, Your Honor.

MR. RANTISI: Yes, Judge.

THE COURT: Okay. And then in terms of opening statements, closing arguments, questions, you can stand up, sit down, move around, use the podium. You just can't go in that dark-blue area in front of the jury box, right? No-fly zone.

Are we ready?

MR. RANTISI: Yes.

MR. WEIR: Yep.

THE COURT: Okay. Bring the jury in, please.

MR. WEIR: Oh, the "acting." Your Honor, there was one thing, and I apologize.

THE COURT: What's that?

MR. WEIR: There is one thing.

THE COURT: What's that?

MR. WEIR: It's very small, but the stipulations we handed up list Greg Gilmore as the

Acting U.S. Attorney, but he has since been sworn in as the U.S. Attorney.

THE COURT: Oh, really, here?

MR. WEIR: He has, Your Honor. We would just ask the Court to strike that with a pen.

THE COURT: Okay.

MR. WEIR: I've talked to Mr. Rantisi. He has no issue with that. Or we have unsigned copies but --

THE COURT: I don't think these folks really care whether or not he was sworn in or not.

MR. WEIR: I don't think Mr. Gilmore would care either but --

THE COURT: Are they on their way?

COURT SECURITY OFFICER: Yes.

THE COURT: All right.

(The jury was brought in.)

THE COURT: Does anybody have anything to report to me? Have you all maintained silence about this case?

Okay. So what's going to happen next is I'm going to read you some preliminary instructions of law, and then we'll have opening statements.

Members of the jury, now that you have been sworn, I will give you some preliminary

instructions to guide you in your participation in the trial. It will be your duty to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then have to apply to those facts the law as the Court will give it to you.

You must follow that law whether you agree with it or not. Nothing the Court may say or do during the course of the trial is intended to indicate in any way what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Certain things are not evidence. I will list those for you now.

One: Statements, arguments and questions by lawyers are not evidence.

Two: Objections to questions are not evidence. Attorneys have an obligation to their clients to make objections when they believe evidence being offered is improper under the Rules of Evidence. You should not be influenced by the

objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Three: Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

And fourth: Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in this courtroom.

There are two kinds of evidence -- direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you are to consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how

much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are three basic rules about a criminal case you must keep in mind.

First: The defendant is presumed innocent until proven guilty. The indictment brought by the government against the defendant is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second: The burden of proof is on the government throughout the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified.

And third: The government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later, but bear in mind that in this respect, a criminal case is different from a civil case.

And now a few words about your conduct as jurors. You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom. This means that during the trial, you must not conduct any independent research about the case, the matters in the case, and the individuals involved in the case. In other words, you should not consult dictionaries or reference materials, search the internet, websites, any electronic source to obtain information about the case or to help you decide the case. Please do not try to find out information from any source outside the confines of this courtroom. Until you retire to deliberate, you may not discuss the case with anyone, even your fellow jurors. After you retire to deliberate, you will begin discussing the case with your fellow jurors, but you cannot decide the case -- excuse me, you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.

I guess everybody today has cell phones; we use the internet, other tools of technology. You must not talk to anyone at any time about this case or use any of those electronic or digital tools to

communicate with anyone about the case. That includes your family and friends. You may not communicate with anyone about the case on your cell phones, email, et cetera. You may not use anything like social media or anything else that I haven't specifically mentioned. If you find out that someone on the jury has done that, you need to report that to me. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result which would require that the entire trial process start over.

And finally, don't form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

If you want to take notes during the course of the trial, you're welcome to do so; however, it's difficult to take detailed notes and pay attention to what the witnesses are saying at the same time. It's not just the words spoken but looking at them, looking at their demeanor while they're testifying. If you do take notes, be sure your note-taking does not interfere with your listening to or considering all the evidence. Also, if you take notes, don't discuss them with anyone before you begin your

deliberations. Do not take your notes with you at the end of the day. Be sure to leave them in the jury room.

If you choose not to take notes, remember it's your own individual responsibility to listen carefully to the evidence. You can't give this responsibility to someone who is taking notes. We depend on the judgment of all members of the jury. You must remember the evidence in the case.

And now the trial will begin. First, the government will make an opening statement which is simply an outline to help you understand the evidence as it comes in. Next, Defense Counsel will make an opening statement. Opening statements are not evidence, and they're not argument.

The government will then present its witnesses, and counsel for the defendant may cross-examine them. Following the government's case, the defendant may, if he wishes, present evidence -- present witnesses whom the government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the Court will instruct you on the law. After that you will

retire to deliberate on your verdict.

So are we ready to begin?

MR. WEIR: Yes, Your Honor.

THE COURT: Go ahead.

MR. WEIR: Thank you, Your Honor. May it please the Court. Mr. Rantisi.

Ladies and gentlemen, first of all, thank you for being here. You are the people that, through this process, both ourselves and Mr. Rantisi have chosen to hear this case. And it is not an overly complicated case; it's not going to take a long time, but it is, obviously, important. It's important for many reasons, so please just pay attention to the evidence that you see here in court, pay attention to the circumstances of that evidence, pay attention to all the things that the judge has instructed you on, and at the end of this trial, we'll stand back up here -- myself and Miss Ortiz -- and ask that you find the defendant, Jason Helems, guilty of all counts.

Now, the evidence in this case is a little bit unique in that you're actually going to see almost the entirety of the crime on a video. And you'll hear that essentially law enforcement officers got information that a semi-trailer was coming to the

Peoria area to drop off a large amount of cocaine. Officers were able to find that semi, and they were able to watch it. And for the most part, it did a whole lot of nothing. It sat out at Bass Pro Shop in East Peoria for a long time. It sat at the Wal-Mart near the Bass Pro Shop for a long time. Then it moved to a Lowe's here in Peoria, and at that Lowe's, Jason Helems drove his truck -- registered in his name -- up to that truck with his passenger, Edu Reteguin. They met with the driver of that truck. You'll see the driver of that truck grab three items out of the semi, hand them to Mr. Reteguin in the front seat passenger side of that truck. Mr. Helems will then drive away.

Now, this video was taken by a helicopter, so the helicopter follows Mr. Helems as he kind of just drives around for a little while. And at some point, a Peoria Police Department officer pulls up behind Mr. Helems, turns on his lights, tries to do a traffic stop. At that time, Mr. Helems flees the scene at a high rate of speed, reaching over 70 miles an hour at some points, but the helicopter has no problem keeping him on video because it has a very, very good camera, and they're able to follow his movements as he drives around.

And as he drives around, you'll see packages coming out of that car. They turn out to be the same three packages that were picked up from that semi. And you'll see all this because it's at night, and so it's on infrared camera, and anything warmer than the air glows. You'll see these glowing items fly out of the car while Mr. Helems continues to flee -- first one, then another, then another.

Then you'll see Mr. Helems park his car, and you'll see him and Mr. Reteguin get out and run on foot. And then you'll actually see the police take them into custody.

Now, the officers that were working this case are getting information from the helicopter, and they go to the area where all these items were thrown out, and what you'll hear and what you'll see is that eventually they recovered 37 kilos of cocaine in those three bags, broken up 9 in one and 14 in the other two. You'll hear that 37 kilos is about $750,000 worth of cocaine. It's a large amount.

Again, pay attention, watch the video, consider the facts, the circumstances surrounding everything, and at the end, we will ask for a

guilty verdict.

Thank you.

THE COURT: Thank you.

MR. RANTISI: May it please the Court, Counsel.

Good afternoon, ladies and gentlemen of the jury. The evidence in this case is insufficient to convict Mr. Helems of the two counts that are charged because there is no evidence of Mr. Helems' knowledge and intent. The proof of knowledge and intent is missing because it doesn't exist. That's why you didn't hear anything about knowledge and intent just now. We don't dispute what Mr. Weir just described as far as the semi-truck, the trip to Lowe's, the fleeing and eluding. That's not in dispute.

The question here is, What did Mr. Helems know he was getting into when Mr. Reteguin asked Mr. Helems to drive him to the Lowe's? What did Mr. Helems know about what was being placed in the back of his truck in three duffel bags? And the answer is that Mr. Helems didn't know what he was getting into.

The government wants to distract you with 37 kilos of cocaine. Don't get distracted, by the

way. Whether it's 5 kilos, 100 kilos, 1,000 kilos and in this case 37 kilos, that has nothing to do with what Mr. Helems knew he was getting into that evening.

As I mentioned, the facts about the semi-truck and the exchange at Lowe's, it's not in dispute, but you're going to hear that a lot of the information that law enforcement had was incorrect or unknown. The investigation provided some information from an unknown individual that this was supposed to take place on February 12th. That turned out to be wrong; took place the day before. Supposed to be a delivery of five kilos of cocaine. That turned out to be wrong; turned out to be 37. Turned out that -- it was supposed to take place at the Bass Pro Shop in East Peoria. That also turned out to be wrong; it took place at the Lowe's in Peoria. You'll hear that no officer had any information that Mr. Helems was going to be the one receiving, that Mr. Reteguin was going to be the one receiving. That information was also unknown.

And I think by the end of this, you'll see that Mr. Helems didn't -- that there's no evidence that Mr. Helems knew why he was going to Lowe's as far as drugs are related.

You'll hear from Mr. Helems. Even though he has a right to remain silent -- you've heard that a few times -- he's going to waive that right. He's going to testify in this trial, and you're going to hear from him. You'll be able to judge his credibility and his testimony, and he'll explain to you what he was doing that day, why it was he found himself at the Lowe's parking lot, why he was with Mr. Reteguin, and how what he thought to be an innocent trip to Lowe's turned out to be a car chase that he didn't expect, didn't anticipate, and didn't want.

He ended up with a bag of -- three bags, in fact, of who knows what, three duffel bags that are zipped up. We don't know what's in them at this stage. They're in the bag. He found himself in the middle of a drug deal at Lowe's, and now he's got two guys who are speaking with each other, putting duffel bags in the back of the car, speaking in Spanish. He doesn't understand what they're saying. And now he's being directed where to go. He's being directed, when he gets stopped by the police, to take off, to go, go, go. And he'll -- he panicked. That's what this is. He totally panicked when the officer stopped him.

The fact that he was present when the drugs were exchanged is not enough to convict. You'll receive a jury instruction on that.

This all comes down to what the government can prove that Mr. Helems actually knew what was going to happen that day. Government wants you to connect the dots, and they want you to do it because they can't do it. They can't provide you any proof of his knowledge and his intent. Without the proof of knowledge and intent, there is reasonable doubt.

Mr. Helems is not guilty as to both counts. I say that now, and I will say it again at the end of the trial.

Thank you for your time and attention.

THE COURT: Thank you.

Are you ready with your first witness?

MR. WEIR: Yes, sir. The government calls Cody Wilson.

THE COURT: Okay. You can turn that podium around if you want.

Would you come all the way up, sir? All the way up. Thank you. Raise your right hand to be sworn.

**(Witness sworn by the clerk.)**

THE COURT: Have a seat here, please. Please keep your voice up so all these folks can hear you.

THE WITNESS: Yes, Your Honor.

THE COURT: Okay? Thank you.

Go ahead.

MR. WEIR: Thank you, Your Honor.

**CODY WILSON,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MR. WEIR:

Q. Sir, can you please state your name?

A. My name is Cody Wilson.

Q. Can you spell -- how do you spell Cody?

A. C-o-d-y.

Q. What is your current job?

A. I'm a detective with the Peoria Heights Police Department, and I'm assigned to the Peoria Metropolitan Enforcement Group as the director.

Q. And what is the Peoria Metropolitan Enforcement Group?

A. Peoria Metropolitan Enforcement Group is a -- it's a multijurisdictional task force, operates under the umbrella of the state police. It's staffed by local law enforcement and state law

enforcement, and local law enforcement is given state police credentials.

Q. Does -- I'm going to use the term "PMEG." Is that a short version of --

A. It is, yeah.

Q. -- that?

So, does PMEG have a focus when it comes to the types of cases that it investigates?

A. Yes, sir. Narcotics, firearms, human trafficking and gangs.

Q. And so you work for a local police department, the Peoria Heights Police Department, correct?

A. I do.

Q. How does it happen that you become a part of an Illinois State Police task force?

A. It's essentially a task force assignment as laid out, like I talked about, like how the MEG is formed and staffed. So my assignment is a task force assignment similar to any federal task force, as an example. That's, that's how that works.

Essentially, I'm given state police credentials because I'm assigned to a task force that operates under the umbrella of the state police.

Q. And are many of the other members of that task

force in the same kind of situation, where they come from a different law enforcement agency but work under the umbrella of the Illinois State Police?

A. Yes, any of our local law enforcement staffing is given the same credentials.

Q. I'm going to direct your attention to February 11th of 2023.

Were you involved in an investigation in the Peoria, Illinois, area that led to the arrest of Jason Helems and Edu Reteguin?

A. I was.

Q. How did that come about?

A. A local DEA task force officer called me. He was looking for staffing for an investigation that came about in regards to some intelligence that was coming out of the field -- the DEA Chicago field office about a semi-truck that was supposed to be coming through the Peoria area to deliver a large amount of cocaine.

Given our relationship with the DEA, not uncommon for me to receive a call like that and not uncommon for us to assist.

Q. And did you, in fact, assist in that investigation?

A. Yes.
Q. And before any kind of investigation like this starts, is there a plan or a meeting?
A. Yes, we had a summary briefing in this case at the Morton Police Department.
Q. And during that briefing, did you come up with some sort of a plan of how to conduct this investigation?
A. We did. Our initial plan was to go to the area of Bass Pro Shop in East Peoria. That's where the intelligence was telling us we could likely acquire this semi. Our plan was to go there, and then our next actions dictated whatever that semi did.
Ultimately, if they're -- if this played out the way that we were hearing that it would loosely, if there was a pick-up vehicle, my team and local elements of the DEA would transition their investigative focus to that pick-up vehicle, and DEA Chicago resources would then focus on the semi and follow it away.
Q. Now, at the beginning of this investigation, was there any information on who might be coming to get this load of drugs?
A. Not that I was made aware of, no.

Q. And so is it safe to say that you were essentially watching this semi to see if and when anyone met with it?
A. Correct. That was our group's intent.
Q. Now, due to your involvement in the PMEG -- and, I'm sorry, how long have you been involved with PMEG?
A. Over the course of the last 13 years, I've had several stints of assignment there. I've been there for the last consecutive five years full time.
Q. So were you familiar with this type of investigation?
A. Yes.
Q. And you said you went to the Bass Pro Shop to look for the semi. Were you or other law enforcement officers successful in finding that semi?
A. Yes.
Q. And when you get to the area in a situation like this, how do you guys set up to kind of keep an eye on things?
A. That particular day, we had ground and air surveillance resources so we had some primary -- we had some primary elements that were surveilling the

truck where it was parked, some secondary elements which, which was -- I was in that role, to be, you know, to be ready in case things went mobile, to stay mobile, to relieve primary units, if necessary, things like that.

And then we had air surveillance as well. Homeland Security was flying a helicopter for us. So generally in these situations, if we have air surveillance, they have the primary eye. That's why they're there.

Q. Well, you just used a couple terms with the jury, "primary" and "secondary." What would "primary" be for the ground people, not for the helicopter in this case? What does that mean?

A. "Primary" for the ground people would be someone is parked in a position to see whatever we're watching directly. Like that's their, their -- that's their purpose to be there. They're there to watch that specifically.

Q. And are there concerns about getting too close to what -- who or what vehicle you're watching?

A. Certainly.

Q. So when you say there have been some -- primary people are in a position to see, does that include by using any kind of enhancement like

binoculars or anything like that?
A. Yes.
Q. And so on that date, were you receiving information from other law enforcement officers involved in this investigation?
A. Yes.
Q. And based on the information -- well, let me back up.
Is it safe to say that you were out at the Bass Pro Shop and Wal-Mart area for an extended amount of time?
A. I would say so, yes.
Q. And did anyone, to your knowledge, see anything occur that was important to the investigation as far as a meeting or anything?
A. No, not that -- not that was reported over the radio, no.
Q. Now at some point, did officers receive information that this potential meeting point was being moved?
A. Yes.
Q. And was a location given?
A. Yes, to Lowe's in Peoria.
Q. And based on that information, what actions did you and the other officers take?

A. Once the semi began to move, our group moved with it and followed it to Lowe's in Peoria.
Q. And again, was it the same concept that you just described where there were primary observation people and secondary observation people?
A. Yes.
Q. And did that truck, in fact, arrive at Lowe's?
A. Yes.
Q. And did officers arrive in the area to conduct surveillance?
A. Yes.
Q. And now, now that we are at Lowe's, where were you approximately?
A. Approximately in the area. I stayed mobile because I knew that if everything went the way we anticipated it would, we were going to go mobile with an element of this situation at some point. So I stayed on the outer perimeter surveillance, ready to deal with that when it happened.
Q. Were you able to see the semi at Lowe's from where you were?
A. No.
Q. And I assume that during these types of investigations it's important to keep in touch with other officers in the area?

A. Yes.
Q. And were you able to keep in touch with officers in this case?
A. Yes.
Q. And how was that done?
A. We had radios.
Q. So, assuming that you guys saw someone meet with that semi and then drive away, what was the plan to follow up on that vehicle that had arrived and met and then left?
A. The plan we had in place was that once the pick-up vehicle left that scene, we would follow it. We had a uniformed Peoria officer and a K-9 on standby, and the plan was for them to make a standard, conventional traffic stop on that vehicle to get it stopped and then further investigation from there.
Q. Is that a standard sort of plan for a drug investigation?
A. Yes.
Q. And you mentioned having a marked, uniformed officer. Were you and the other agents that we were just discussing that were doing surveillance marked in any way at this time?
A. No.

Q. What were you guys wearing?
A. Regular street clothes. We were driving regular vehicles.
Q. So there's no police decals on these vehicles, no sirens, lights?
A. No.
Q. So you would need someone from the outside to come in and do a traffic stop that had an actual marked vehicle. Is that accurate?
A. Yes.
Q. And what's the purpose of letting this vehicle get away from the meet area and be stopped by a marked unit?
A. There's a couple reasons behind that, the first being that if everything goes the way we intend in that scenario, that can just be a calmer setting for an interdiction. A traffic stop is a conventional and normal occurrence. So it can keep a -- it can keep a level -- it can keep a level of calmness depending on how the suspect reacts to, to that situation, obviously.
Also, it can help preserve our investigation for a time. It can help preserve our source of intelligence. It can help preserve that we have a source of intelligence, and for a time we can

maintain an element of surprise for the totality of what we're, we're actually doing on this particular night.

Q. When you said that it would be calmer, is that as opposed to just basically swarming the semi and the vehicle as soon as they meet up in that Lowe's parking lot?

A. Yes. The -- obviously, to protect life or with -- if there's exigency of any kind, obviously, we're going to do what we have to do. But this is a good, solid, basic plan that works often so that -- that's our intent for using it. You know, that's our -- that's why we use it as a base plan to approach because it's a calm, soft approach.

If something were to change or create an exigency or danger, we would have to make certain decisions.

Q. And I believe you testified to this earlier, but you had no clue who was in the semi, correct?

A. No.

Q. And you didn't know who was going to show up, if anyone did show up to do this pick-up, correct?

A. Correct.

Q. So you have no background on those people or whether there's a history of violence or anything

like that?
A. Correct.
Q. And is it safe to say that large drug deals often involve firearms?
A. Yes.
Q. So there's always that possibility as well, correct?
A. Yes.
Q. So getting these vehicles away from a commercial parking lot, outside where you can deal with them on a one-on-one, is that a preferable outcome?
A. That is preferable, yes.
Q. And now at some point did you hear over the radio that there had been a pick-up between a vehicle and the semi-truck at the Lowe's parking lot?
A. Yes.
Q. And were you getting information from someone in the helicopter at that time?
A. Yes.
Q. And without going into specifics, was the helicopter giving directions of travel and things like that, describing where this truck was going at the time?

A. I, I don't remember specifically this turn by turn or anything like that, but yes, that would be -- that's, that's what they were doing.
Q. I guess a general direction of travel?
A. Yeah.
Q. And because of that information, what actions, if any, did you take?
A. So I went with the group on this surveillance and maintained some distance because, again, we had air support, and our intent was to have a uniformed officer stop this vehicle. And resources were falling into place for that to happen. So I went with the group and then -- until I started to hear the officers call out that they were doing the stop.
Q. Okay. And again, you're in an undercover --
A. Correct.
Q. -- position, correct?
A. Yeah.
Q. And at some point did you hear that -- I think you just said it; I want to make sure.
At some point did you hear over the radio that a marked unit was making a stop on the vehicle?
A. Yes.
Q. And after that, do you remember hearing that

the vehicle had not stopped and was now fleeing?
A. Yes.
Q. And were you still getting directions -- general directions of where this vehicle was headed from the helicopter?
A. Yes.
Q. And so based on that information, what were you trying to do?
A. I was trying to be as intuitive as possible, to head towards the area of where this event was going.
Listening to the directions I was hearing, I recall thinking that we're getting -- we're likely getting close to a point where whoever's in this vehicle is going to stop it, get out of it and run on foot. So, I tried to head towards the direction of, of the neighborhood and area where that was likely to happen so I could be useful if that is the scenario that played out.
Q. And eventually, did you hear over the radio that the two people in that vehicle had gotten out and fled on foot?
A. Yes.
Q. And at that time did you respond to the area where it was reported that they were on foot?

A. I did.
Q. And what happened when you got to that area?
A. Once I got to that area, those two gentlemen were already in custody. And once we maintained -- once we were able to secure that scene, I'd heard a transmission from one of the other officers with our group -- Inspector Al Holocker -- and he had located some suspected evidence from this a few blocks away so I went to his location. He was just finishing up picking that stuff up off the street.
And that was the end of it.
Q. So you weren't involved in actually taking either Mr. Helems or Mr. Reteguin into custody; is that correct?
A. Correct.
Q. And did you personally gather any of the evidence?
A. No.
MR. WEIR: If I may have just a brief minute, Your Honor?
THE COURT: You may.
(A pause was had in the record.)
BY MR. WEIR:
Q. To clarify -- I think I might have misspoke. This all occurred on or about February 11th of

2023; is that correct?
A. That's correct.
MR. WEIR: Thank you, Your Honor. No more questions.
THE COURT: Okay.

**CROSS-EXAMINATION**

BY MR. RANTISI:
Q. Good afternoon, Officer.
A. Good afternoon, sir.
Q. When you were at the Bass Pro Shop, you were secondary as far as surveillance goes?
A. I was in a secondary position, yes.
Q. Could you see the semi-truck from your location?
A. No.
Q. At any time did you see the semi-truck while it was in East Peoria?
A. No.
Q. How long were you at East Peoria?
A. I'd have to approximate.
Q. Okay.
A. I would approximate it at three hours or less.
Q. And since you never saw the semi-truck, is it also safe to say that you also did not see the semi-truck driver?

A. Correct.
Q. Do you know the semi-truck driver's name?
A. No.
Q. Have you ever looked into who that individual was that was delivering the drugs to Central Illinois?
A. I have not, no.
Q. When you testified earlier today that the information either you or somebody in the group received was that it was -- location was changing to the Lowe's in Peoria -- is that right?
A. Yes.
Q. Who provided that information to you?
A. It came over the radio. I don't recall who.
Q. You don't remember who said it?
A. Correct.
Q. What was the source of that information?
A. I was told that it was coming from a source in Chicago, through the DEA up there.
Q. And you already said that you didn't know who was receiving the drugs at any point in this investigation?
A. Correct.
Q. When you get to Lowe's, are you still secondary?

A. Yes.
Q. At any time while you were at Lowe's, did you see the semi-truck there?
A. No.
Q. So you also didn't see the semi-truck driver?
A. Correct.
Q. Did you see my client?
A. No.
Q. And you've testified a little bit earlier today about the fact that you guys have this plan, and it's calmer, I think is how you described it, to just make this traffic stop. Is that right?
A. Correct. That was our intent.
Q. That was the plan?
A. Yes, sir.
Q. Why wouldn't you guys go make a stop and arrest maybe all three of these individuals at Lowe's?
A. It wasn't our plan.
Q. Okay. Mr. Weir asked you about maybe there's a firearm involved, right? You don't know who these people are; they might have a firearm?
A. It's possible, yes.
Q. And that's something that might be common for a drug deal?

A. Possibly, yes.
Q. And you don't want to get shot, right?
A. Correct.
Q. You don't want anybody else in the area to get shot; is that correct?
A. That's correct.
Q. You don't want -- whether it's these three individuals or people shopping at Lowe's or Target or T.J. Maxx to get caught in any sort of crossfire; is that right?
A. That's correct.
Q. And that's because you don't know who these people are?
A. Correct.
Q. It's more of a volatile situation when you have drugs involved, right?
A. It can be, yes.
Q. Now, you said you wanted to preserve the investigation. Tell us more about what that means.
A. Concealing that we're acting on live intelligence. At that point, there's just -- there's just nothing good that comes from letting, letting the suspect know that that's a part of this.
In theory, if, if the suspect thinks that

they're just being stopped randomly, they're likely to, to stay calm just like we are, and then we can -- we can move through this with all of our common tools. We can do a K-9 sniff, and we can go -- we can go through this in a legal way just on the outside of our intelligence so we don't have to reveal that at the moment.

Q. And you've testified that things are changing as, as the day goes on, right?

A. Yes.

Q. You're getting live information about the change from Bass Pro Shop to Lowe's, for example?

A. Yes.

Q. Do you have any information as to whether this was being communicated to the semi-truck driver?

A. Oh, I'm not sure about that. I don't know.

Q. Do you know if the semi-truck driver's communicating with somebody else?

A. I don't know.

Q. Have you ever looked into that?

A. I have not.

MR. RANTISI: I have nothing further.

THE COURT: Okay.

**REDIRECT EXAMINATION**

BY MR. WEIR:

Q. Officer Wilson, you just testified that this traffic stop was a means of trying to protect information. Do you remember testifying to that?
A. Yes.
Q. You've been involved in many drug investigations, correct?
A. Yes.
Q. Is information from various sources a large part of drug investigations?
A. Yes.
Q. And is it important to protect sources of that information?
A. Yes, it is.
Q. Now, you've also -- well, is it fair to say that you've taken part in many drug transactions as an officer?
A. Yes.
Q. Is it uncommon for drug transactions to change place or time or even amounts, in your experience?
A. Not uncommon.
Q. And then finally, with regards to the plan, what was the plan for the semi-truck when it left the area?
A. My only knowledge of what the plan for that truck was was for DEA Chicago resources to follow

that away. It was unknown to me at the time what they planned to do after that.
Q. So in other words, state and local officers followed the person that showed up from the area, and Chicago DEA followed the semi-truck out of the area?
A. Yes.
MR. WEIR: No further questions, Your Honor.
MR. RANTISI: No questions.
THE COURT: All right. Thank you, sir. You may step down.
THE WITNESS: Thank you, Your Honor.
THE COURT: Call your next witness, please.
MR. WEIR: Your Honor, may the witness be excused?
THE COURT: I'm sorry?
MR. WEIR: May the witness be excused?
THE COURT: Yes.
MR. WEIR: We call Marcus Eder, Your Honor.
THE COURT: All right. Step up here, please.
THE WITNESS: Yes, sir.
**(Witness sworn by the clerk.)**
THE COURT: Have a seat here, please.
Go ahead.
MR. WEIR: Thank you, Your Honor.

**MARCUS EDER,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MR. WEIR:

Q. Sir, can you please state your name and spell your last name for the record?
A. Marcus Eder, E-d-e-r.
Q. And what's your current job?
A. I'm a technical enforcement officer with Homeland Security Investigations.
Q. So, what does that mean?
A. I'm responsible for assisting in criminal investigations through electronic surveillance techniques such as cameras, audio recording devices.
Q. So, is it -- does that mean you're not like a special agent or anything?
A. No, sir.
Q. In your capacity with his, does that include recording equipment?
A. Yes, sir.
Q. And do you work with various types of recording equipment in your job?
A. Yes. Yes, sir.

Q. And as part of your duties, do you conduct surveillance?
A. Yes, sir.
Q. And do you personally go out and conduct that surveillance yourself sometimes?
A. Yes, sir.
Q. Does it also involve equipping agents with the proper items they need to go out and conduct their own surveillance?
A. Yes, sir.
Q. I'm going to direct your attention to February 11th of 2023.
Were you involved in an investigation in the Peoria, Illinois, area on that date?
A. Yes, sir.
Q. What was your job on that date?
A. I was a crew member in a surveillance helicopter.
Q. And is that something that you've done before?
A. Yes, sir.
Q. Is it safe to say it's sort of a routine duty that you do?
A. Yes, sir.
Q. And who were you with on that day?
A. The pilot was Todd Cox, C-o-x.

Q. Does he also work with his?
A. No, he's with Customs and Border Protection, Air and Marine Operations.
Q. And again, is it his job to fly helicopters or other aircraft for that purpose?
A. Yes, sir.
Q. And while you were in this helicopter, what kind of equipment were you using?
A. I was using a camera with -- a surveillance camera with daylight, low-light infrared capabilities.
Q. Was that a device that you had used before?
A. Yes, sir.
Q. Were you familiar with that device?
A. Yes, sir.
Q. And prior to recording things, you routinely keep up maintenance on these devices so they are working in the proper order?
A. I make sure they're in working order. I don't specifically do a maintenance on them.
Q. And was there anything about this camera that allowed it to record at long distance?
A. Yes, sir.
Q. And now, you said you were in a helicopter. Is that an issue when you're surveilling a certain

area, especially during the day?
I'm going to strike that question. That was a bad question.
Being in a helicopter, is there a risk of being seen?
A. If we're too close to the person we're doing surveillance on.
Q. And using these kind of long-distance cameras, does that allow you to take up a position where you can't be seen?
A. Yes, we just increase our distance to avoid being seen.
Q. And were there other features such as mapping and speed that --
MR. RANTISI: Objection, leading.
THE COURT: Sustained.
BY MR. WEIR:
Q. Did the camera you were using have any special features?
A. Yes, sir. In addition to the low-light infrared, it has a map overlay with speed detection as well.
Q. And what information did you have when you started conducting surveillance on that day?
A. The location of where a semi-truck was

supposed to meet up with another person.
Q. And approximately how long do you remember conducting surveillance from the helicopter on February 11th, 2023?
A. It was approximately two hours.
Q. And do you remember where you started?
A. Where?
Q. Where did that surveillance start?
A. Bass Pro Shops in East Peoria.
Q. And eventually, did you see that semi move locations?
A. Yes, sir.
Q. And did you follow the semi with your camera?
A. Yes, sir.
Q. And were you able to keep sight of the semi the entire time?
A. Yes, sir.
Q. Eventually, did that semi arrive at a Lowe's in Peoria?
A. It did, yes, sir.
Q. And were you able to see exactly what was being recorded while you were recording it?
A. Yes.
Q. So while that semi was parked at Lowe's, did you witness a vehicle that met with the semi?

A. I did, yes.

MR. WEIR: Your Honor, at this time I'd move to admit Government's Exhibit 1 and then ask to publish.

THE COURT: Is that film, or what is it?

MR. WEIR: Oh, I'm sorry. It's the video, Your Honor.

THE COURT: Okay.

MR. WEIR: And I would ask to publish a portion of it being --

THE COURT: You may.

MR. WEIR: -- 1A.

THE COURT: So turn down the lights, Dan.

Could we have him describe what we're first looking at here, please?

MR. WEIR: Yes, sir.

BY MR. WEIR:

Q. Can you please describe for the jurors what this is an image of?

A. That's an infrared image of the camera. It's looking at the semi-truck toward the middle of that screen.

Q. Was there a particular reason you started using infrared?

A. Just it became dark outside.

MR. WEIR: Go ahead, please.

(Whereupon, the video recording was commenced.)

MR. WEIR: You can pause it, please.

Q. Sir, can you please describe what was just shown on the video?

A. The driver of the semi-truck transferred bags from the passenger side of the semi-truck into the pickup truck.

Q. Now, while you're watching this, were you able to communicate with officers on the ground?

A. Yes, sir.

Q. And were you putting out information that you were viewing in real time?

A. Yes, sir.

(Whereupon, the video recording was commenced.)

Q. Sir, while this truck is traveling, are you calling out where it is traveling, like direction of travel?

A. Yes, sir.

MR. WEIR: Would you pause it?

For the record, the video's been stopped at 18:41:20.

Q. Can you describe what just -- what was just

seen on the video?
A. There's an attempted traffic stop. The vehicle initially pulled over and stopped and then sped away.
MR. WEIR: Can you continue, please?
(Whereupon, the video recording was commenced.)
MR. WEIR: If you could stop it, please.
Your Honor, I'd like to play this next part in slow motion.
THE COURT: Okay.
(Whereupon, the video recording was commenced.)
MR. WEIR: If we could pause it right there?
Q. Sir, did you just see a glowing item --
A. Yes, sir.
Q. -- appear on the screen there?
A. Yes, sir.
Q. Where did that item come from?
A. From the passenger side of that vehicle.
Q. Did it appear that that item had been thrown out of the front seat passenger side window?
A. Yes, sir.
MR. WEIR: If we could continue at regular speed?

(Whereupon, the video recording was commenced.)

MR. WEIR: If you could stop it right there?

We're going to go slow motion again, Your Honor.

(Whereupon, the video recording was commenced.)

Q. And, sir, did you again see -- can you describe what just happened in the video clip that we just watched?

A. A large item was thrown out of the passenger window of the vehicle.

Q. And are you calling this out as well in real time?

A. Yes, sir. Yes, sir.

Q. Does that include locations?

A. Yes, sir.

(Whereupon, the video recording was commenced.)

Q. And, sir, can you describe what just occurred in that clip?

A. Another large item was thrown out of the passenger window of the vehicle.

Q. And is it that glowing spot in the street there right behind the truck?

A. Yes, sir.
Q. And can you see the little black images around that?
A. Yes.
Q. Do those appear -- or can you tell from the video where those came from?
A. They came from the same spot as the bag.
Q. And did those little items appear to come out of the bag when it hit the ground?
A. They did, yes.
(Whereupon, the video recording was commenced.)
MR. WEIR: If you could stop it?
Q. Sir, you said that this is an infrared camera. Can you just briefly tell the jury how that works as far as what's lit up and what's not?
A. It just detects the heat of the environment, and it forms a visual picture. The hotter objects are -- appear whiter, and the colder objects are black.
Q. And so if an item was inside an area that was warm and then put out into the cold air, would it glow?
A. Yes.
Q. And then you just saw in that clip, I believe,

glowing around the truck. What is that?
A. Underneath, just heat. It could be from the brakes, the engine running hotter, exhaust.
Q. Thank you.
(Whereupon, the video recording was commenced.)
MR. WEIR: Can you stop it, please?
Q. And, sir, in that last clip, can you describe what we just saw?
A. The vehicle pulled to the side of the road, and two subjects got out of the vehicle and fled.
Q. And did you notice, before that vehicle pulled to the side of the road, it appeared the passenger -- the front passenger side door came open before the vehicle was stopped?
A. Yes. Yes, sir.
Q. And can you -- is it safe to say that the person that got out of the passenger side is the larger of these two figures?
A. Yes.
Q. And so then the smaller, obviously, did he come from the driver's side?
A. Yes.
(Whereupon, the video recording was commenced.)

MR. WEIR: Can you pause it right there?
Q. And, sir, in that clip right there, the passenger who we've identified as the larger blob, did you see that person appear to throw something on the ground?
A. Yes, he dropped something on the ground.
Q. And that was that small --
A. Pardon me?
Q. It was a small, glowing item?
A. Yes, sir.
(Whereupon, the video recording was commenced.)
Q. And there again, did that same individual appear to throw something on the ground right at his feet?
A. Yes, he dropped another small object.
MR. WEIR: We can take that down.
Thank you.
Q. Mr. Eder, there was -- it appeared to be a speed being displayed on the screen during that video. Is that -- is that correct?
A. Yes. Yes, sir.
Q. And how does that function work on the camera?
A. It measures the speed of the crosshairs at which I'm moving the camera over the ground. It's

not the actual vehicle speed. So as long as the crosshairs are kept on the vehicle, it's accurate to vehicle speed.

Q. And at times during that video, did you see that miles-per-hour measurement going above 70 miles an hour?

A. I believe so, yes.

MR. WEIR: One second, Your Honor, please.

(A pause was had in the record.)

MR. WEIR: No further questions, Your Honor.

THE COURT: All right. I think we'll take a break before cross, so go to the jury room. Please don't discuss this case.

(Whereupon, the jury departed the courtroom.)

THE COURT: 15 minutes.

COURTROOM DEPUTY: Court's in recess.

(Recess at 2:36 to 2:50 p.m.)

THE COURT: Bring the jury in, please.

So we'll go to around 4:30. I don't like to interrupt cross-examine, so if someone's being cross-examined, we'll try to finish the witness. Okay?

(The jury was brought in.)

THE COURT: You may cross-examine.

MR. RANTISI: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. RANTISI:

Q. Good afternoon, Officer.

A. Good afternoon, sir.

Q. So I want to take you to surveillance at East Peoria at the Bass Pro Shop. How long did you say you were there for or surveilling that area?

A. In total or just Bass Pro?

Q. Let's stay with the Bass Pro Shop. How long do you think you were there?

A. Approximately 45 minutes maybe.

Q. Okay. And you're the one that's operating the camera, correct?

A. Correct.

Q. And do you see exactly what we see on this video when you're looking at the camera?

A. Yes.

Q. We now just watched approximately -- I think it's 15 minutes or so of video, but there's actually a much longer clip, correct?

A. Correct. Yes.

Q. And it captures the surveillance you were conducting at East Peoria Bass Pro Shop for the 45 minutes or so?

A. Yes.

Q. At any time at the Bass Pro Shop, did you see the driver of the semi-truck outside of his truck?
A. I don't recall seeing him outside the truck at the Bass Pro.
Q. Say that again.
A. No, not at the Bass Pro.
Q. Okay. After he left Bass Pro, did he go to the Wal-Mart nearby?
A. He did.
Q. At any time that he's parked at the Wal-Mart nearby, did you see the driver of the semi-truck outside of the semi-truck?
A. He did, yes.
Q. Okay. What was he doing?
A. He is walking around the truck. He is around the passenger side. He had the hood up. It was in infrared so I couldn't really -- I didn't have great detail exactly.
Q. Okay. Well, you testified a little bit ago that you could see three duffel bags being put into the truck. Do you recall that?
A. Yes.
Q. You were able to see that they were duffel bags?
A. I don't think I said duffel bags. I said bags

or large items.
Q. You said bags. So you were able to see that they were bags, or do you know that because of some separate knowledge?
A. When he picked them up, they appeared to be bags. Appeared like he was holding the handle or something.
Q. So you were able to see bags when he was at Lowe's?
A. Correct.
Q. And now you're telling me you can't see any great detail?
A. At the Wal-Mart, he's standing -- it was his location. He was standing in front of the semi-truck which was hot so his heat signature was kind of obscured by that a little more.
Q. Did you ever see him use a phone?
A. He made movements which could have been a phone, but I wasn't able to 100 percent.
Q. What does that mean? Do you mean he moved his hand up to his head or something like that, or was he texting?
What is it that you thought could have been using a phone?
A. As you could see from the infrared, it's kind

of a -- not a crisp image. It's kind of blurred, just a hand movement like raising, bending at the elbow which could have been using a phone or not.

Q. Did you ever see any movement that would have been consistent with him texting anybody?

A. I -- not definitely, no.

Q. Do you know this individual's name?

A. I do not.

Q. Did you ever take any steps to learn this individual's name?

A. I did not.

Q. Is that even part of what you are responsible for?

A. No, sir. I'm just there to record the meet.

Q. Just surveillance?

A. Correct.

Q. When the semi-truck gets to Lowe's, you testified earlier and we all watched the bags go into the truck, correct?

A. Correct.

Q. And they went into the passenger side; is that right?

A. Yes.

Q. And that's all three bags went into the passenger side?

A. I don't recall without seeing the video how many.
Q. Whatever was transferred from the semi-truck to the black truck, is it safe to say that it all went in on the passenger side?
A. Yes.
MR. RANTISI: Can I have the screen, please?
Q. So this is Government's Exhibit 1A, and I want to draw your attention to that (indicating). Not the best, but can you tell us what I just circled?
A. Could you move the red circle? It's kind of -- okay. That's the date and time in Zulu time.
Q. Okay. What's Zulu time?
A. It's a coordinated time. Universal Time Coordinated, UTC, or Greenwich Mean Time they refer to it. It's just the time in Greenwich, England. It's a universal time that's used in aviation mainly.
Q. So you already kind of said it, but to make sure the jury heard it, you said UTC. Are UTC and Zulu synonymous?
A. To my knowledge, yes.
Q. Okay. So, it is almost 3:00 here in Peoria, Illinois. What time would it be in UTC?
A. Oh, can't remember. It's five or six hours'

difference. It depends on Daylight Savings Time.
Q. Okay. So, here we have -- in the upper right-hand corner it says 18:29. That's military time so that's about 6:30 p.m.?
A. Correct.
Q. And the Zulu or the UTC time is 12:30 a.m. the next day?
A. Correct.
Q. So in February of '23, it was a six-hour difference?
A. Yes.
Q. This is at the 18 hour, 29 minute and 47 second mark of the video. Are you able to make out the parking lines in this video?
A. They're blurry, but yes.
Q. Okay. The semi-truck and the approaching vehicle are parked across the parking lines at this point; is that right?
A. Yes.
Q. And as we hit "Play," the truck that approaches is now turning in front of the semi-truck, correct?
A. Yes.
Q. And I'm going to pause it.
Did it appear to you right before I paused it

that the truck had stopped?
A. Yes.
Q. Now this is at the 18 hour, 30 minute and 9 second mark of the video. We now see to the left, is there another vehicle parked over there across the parking lot lines?
A. On the other lane to the left? Yes.
Q. Yeah, on the left side over here.
A. Yes.
Q. Okay. And the truck that Mr. Helems is driving, where is it stopped?
A. In the middle of the traffic lane.
Q. This is the traffic lane that if other cars were coming through would be -- would use to drive through the parking lot, correct?
A. Yes.
Q. So he's in the middle of the road, so to speak?
A. Yes.
Q. Earlier you testified about the passenger dumping the items, correct?
A. Correct.
Q. Do you know if it's the same items that went into the truck?
A. They appear to be the same size,

approximately.
Q. You feel comfortable saying that it's likely the same items that went in are the ones that came out?
A. Likely, yes.
Q. Based on what you saw?
A. Yes.
Q. And then the passenger tried to bail from the vehicle before it stopped eventually; is that correct?
A. Yes, the door did open.
Q. This is Exhibit 1A at 18:43:17. And I'd ask you to keep an eye on what the driver does after the driver gets out of the vehicle.
(Whereupon, the video recording was commenced.)
Q. How would you describe that?
A. That he got out of the vehicle and ran with the other subject.
Q. Did it appear to you that the driver was following the passenger?
A. He was behind him initially.
Q. All right. And there was a little bit of a zigzag, and the driver stayed behind the passenger, wherever the passenger was running. Is that --

would you agree with that?
A. Toward the beginning, yes.
Q. Toward the beginning? Is that a yes then?
A. Yes.
Q. The items that were dropped by the passenger, do you know what those are?
A. Just small items.
Q. Okay. Have you, since this time, learned what they are?
A. I heard they were cell phones.
MR. RANTISI: Nothing further.
THE COURT: All right. Any redirect?
MR. WEIR: If I may have just one brief second, Your Honor?
THE COURT: Okay.
(A pause was had in the record.)
MR. WEIR: No, Your Honor. No, no questions.
THE COURT: Oh, okay. Thank you. You may step down.
THE WITNESS: Thank you, sir.
THE COURT: Call your next witness.
MS. ORTIZ: The government calls --
MR. WEIR: Your Honor, may the witness be excused?
THE COURT: Yes.

MS. ORTIZ: The government calls Brian Moore to the stand.

THE COURT: Come up here, please, and raise your right hand to be sworn.

**(Witness sworn by the clerk.)**

THE COURT: Have a seat.

**BRIAN MOORE,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MS. ORTIZ:

Q. Good afternoon. Could you please state your first and last name for the record?

A. Brian Moore.

Q. And where are you currently employed?

A. Peoria Police Department.

Q. And how long have you been with the Peoria Police Department?

A. Just under 12 years.

Q. And just briefly, what are your current job duties there?

A. I'm currently assigned to the Greater Peoria Auto Crimes Task Force.

Q. Were those your same duties back on or about February 11th of 2023?

A. They were not.
Q. And what were your duties back then?
A. I was assigned to the Special Investigations Division, Street Crimes Unit.
Q. And in the course of your experience and job duties, are you familiar with the Peoria and the East Peoria area?
A. I am.
Q. And why is that?
A. I grew up in Peoria.
Q. And did you have occasion to assist the United States Drug Enforcement Administration -- also known as the DEA -- along with PMEG on or about February 11th of 2023?
A. I did.
THE COURT: I'm not sure you need to hold that. If you set it down -- hold on. Just bend it toward you a little bit, I think that will work.
MS. ORTIZ: Thank you, Judge.
THE COURT: Go ahead.
BY MS. ORTIZ:
Q. What was your role on that day with respect to your assistance?
A. I was told there was an ongoing drug investigation and that drugs were supposed to be

picked up from a location, and I was part of the team to effect a traffic stop on the vehicle picking up the drugs.
Q. So on that date, were you operating a vehicle?
A. I was.
Q. And just describe the vehicle that you were operating.
A. It's a semi-marked Chevy Tahoe, maroon in color.
Q. And when you say "semi-marked," what does that mean to us?
A. So it's semi-marked because it still has police lights, but they're not overt. There's no light bar over the, the roof of the vehicle. They're hidden inside the -- inside the cab up by the visors.
Q. And if you were to activate those lights, just describe what they look like when they're activated.
A. The headlights would oscillate back and forth, and there would be red and blue emergency lights also flashing back and forth.
Q. And did you have a partner on that day?
A. I did.
Q. And who was that?

A. Matheson Wood.

Q. And with respect to that day, when did you first observe a Ford F-150?

A. On North Avalon in Peoria.

Q. And what did you do when you first observed it?

A. I ran the registration first.

Q. And what did the registration come back as?

A. Expired.

Q. Did you run who the owner of that vehicle was?

A. I don't recall if I ran the owner. I could just see who the owner was.

Q. You did see? I'm sorry?

A. It gave me a name of who the owner was, yes.

Q. Okay. And what was the name of the owner that was given to you?

A. Jason Helems.

Q. And when you first saw the Ford F-150, how far were you behind it?

A. Not far. If --

Q. What does that mean?

A. I would be guessing but maybe half, half a block.

Q. Okay. And what did you do after you were behind it?

A. The truck pulled over prior to me initiating a traffic stop. So when the truck pulled over, that's when I pulled up on it and turned on my emergency lights.
Q. Do you recall how far you were behind it when it first pulled over before you activated your emergency lights?
A. I don't recall how far behind I was, no.
Q. And you said then you act-- after it had pulled over, then you activated your emergency lights?
A. That's correct.
Q. About how long was it until you activated your emergency lights?
A. It was just a couple seconds from getting close to it.
Q. And describe the area where that F-150 pulled over.
A. It's a residential area.
Q. And what did that F-150 truck do then after you activated your lights?
A. The truck quickly pulled away from the curb and quickly drove south on Avalon.
Q. And what action did you take then?
A. I turned off my emergency lights, and I drove

south on Avalon, not in pursuit, and observed a traffic infraction being made at Avalon and Loucks.
Q. And what traffic infraction did you see getting made?
A. Disregarding a stop sign.
Q. So it ran a stop sign?
A. Yes.
Q. Okay. And you said you weren't in pursuit at that point?
A. I was not.
Q. And why is that?
A. A vehicle fleeing a traffic stop isn't grounds for a pursuit, per our policy. It, it wasn't at the threshold of a pursuit.
Q. Did you know if it was being monitored in any other way besides you?
A. It was. It was being monitored by air ops.
Q. Okay. And by "air ops," do you mean an aerial helicopter?
A. Yes.
Q. Okay. And after it ran that first stop sign, did you keep observing it?
A. From a distance, yes.
Q. And what did you observe it do?
A. It continued to flee, disregarding another

stop sign at Loucks and McClure.
Q. And did the F-150 eventually get out of sight?
A. It did.
Q. Do you recall when it did that?
A. It was very shortly after getting onto McClure.
Q. Were you able to estimate the speeds it was going?
A. Well -- well over the posted speed limit. I would say at least 60 miles an hour.
Q. Now I'm going to show you what's been marked previously as clip 1A, and it's going to be from 18:40 to approximately 18:42:01.
MS. ORTIZ: I'm going to move to publish.
(A pause was had in the record.)
MS. ORTIZ: We're going to have a brief pause due to a technical difficulty.
THE COURT: Sure.
(A pause was had in the record.)
THE COURT: It's not connecting to the system. We've got our IT guy coming down.
MS. ORTIZ: Okay.
THE COURT: Could you maybe go on with some other questions?
MS. ORTIZ: I certainly could. I could,

Judge.

THE COURT: Thank you.

BY MS. ORTIZ:

Q. All right. So, at what point did you lose sight of where the F-150 was?

A. After it turned onto McClure.

Q. And then at another point that same day or evening, did you travel to where you were advised the F-150 came to a stop?

A. I did, yes.

Q. And how were you advised of where it came to a stop?

A. Via radio.

Q. And where was that? Where did it come to a stop?

A. That was in our west bluff area, I believe, off of --

Q. I'm sorry, what is it?

A. West bluff area, off of Willcox, I believe.

Q. And what did you observe when you came to where the F-150 was stopped?

A. I observed the vehicle parked and no one in it.

Q. And what action did you take?

A. I assisted with other officers on scene by

conducting an inventory of the vehicle. As it had fled the traffic stop, it was subject to tow. And I did that on the driver's side.

And after that, a K-9 -- K-9 arrived on scene, and I walked with him doing an article search.

Q. All right. Did you find anything of evidentiary value in either of those activities?

A. I did not.

Q. Did you participate in any other activity in that area?

A. I did not.

Q. Now, later that evening, did you encounter Jason Helems, the driver of the vehicle?

A. I did.

Q. And where was that?

A. That was at the police station.

Q. And did you issue that driver, Jason Helems, the defendant, any citations based upon his earlier actions that day?

A. I did.

Q. And what citations did you issue?

A. Improper turn signal, registration being expired, disregarding the stop signs and fleeing the traffic stop.

Q. And do you see Jason Helems in the courtroom

today?
A. I do.
Q. Can you just point him out and identify him for the record?
A. He's the individual seated at the table on my right side in a gray sport coat and white dress shirt.
MS. ORTIZ: Your Honor, I would ask that the record reflect identification of the defendant.
THE COURT: It will.
BY MS. ORTIZ:
Q. And, Officer, did all these activities that you've just talked about occur in the Central District of Illinois?
A. Yes.
Q. All right.
(A pause was had in the record.)
THE COURT: The technology is wonderful except when it isn't.
(A pause was had in the record.)
THE COURT: Aaron, stick around, would you? Thank you.
(Whereupon, the video recording was commenced.)
BY MS. ORTIZ:

Q. Okay. We're going to start this 1A clip then at approximately 18:40, and we're going to go to 18:42.

While it's up on the screen, are you familiar with this?

A. I am, yes.

Q. And how are you familiar with it?

A. I previously viewed it.

Q. Okay. And what is it? What are we looking at?

A. This is the video from the air ops that evening.

Q. Okay.

MS. ORTIZ: Go ahead.

(Whereupon, the video recording was commenced.)

MS. ORTIZ: Okay. We're going to pause it right there.

Q. Now, are you behind the vehicle, the F-150, at this point in time?

A. Yes, I would have been behind it, yes.

Q. And we're not able to see you, though, on the screen, correct?

A. That's correct.

Q. All right. And it pulls to the curb, as you

previously testified. Is that an activity or an action that you've been familiar with based upon your experience as a law enforcement officer?
A. It is.
Q. And what type of activity is that, based on your experience?
A. It's activity to have the -- have the officer go around somebody. It's -- when somebody does not want an officer behind them, they'll pull into a driveway or pull over to the curb and see if we'll pass.
MS. ORTIZ: Okay. We can keep playing it.
(Whereupon, the video recording was commenced.)
MS. ORTIZ: Now we're going to stop it.
Q. There's a vehicle that pulls up right behind the F-150. What vehicle is that that we're just seeing?
A. That is the semi-marked Tahoe that I previously described.
Q. Okay. So you're in that, driving it?
A. Correct.
Q. All right.
MS. ORTIZ: Go ahead. We'll continue.
(Whereupon, the video recording was

commenced.)

Q. Now, when do you activate your lights?

We'll pause it. When do you activate your lights?

A. Prior to the truck pulling away from the curb.

Q. Okay.

MS. ORTIZ: Go ahead.

(Whereupon, the video recording was commenced.)

MS. ORTIZ: All right.

MR. RANTISI: Your Honor, can we have a sidebar?

(Whereupon, the following occurred outside the hearing of the jury.)

MR. RANTISI: Judge, we've seen this video now once. Now they're playing it again for a guy who testified that he didn't follow this car so --

THE COURT: Well, he followed it for a period of time.

MR. RANTISI: The witness said he didn't pursue because that's policy.

THE COURT: We're not at that point yet so --

MR. RANTISI: I think we are. I think he said he didn't pursue it, so my concern is we're going to keep seeing this video over and over again.

THE COURT: How much more are you going to have him look at it?

MS. ORTIZ: Not long. I'll have him articulate the stop signs.

THE COURT: All right. I'll allow it, but I agree; we don't want to see it a thousand times. But I'll let you do what you're doing.

MS. ORTIZ: Thank you, Judge.

(Whereupon, the following occurred inside the hearing of the jury.)

BY MS. ORTIZ:

Q. We're at now an intersection. Were you able to observe on this video the traffic control devices that were disregarded by the F-150?

A. Yes, it would have been just before this.

Q. Just before this?

Okay. And is the second one coming up then?

A. This would be the second one.

Q. This is the second one. All right. Thank you.

MS. ORTIZ: Court's indulgence for one minute.

(A pause was had in the record.)

MS. ORTIZ: I tender the witness. Thank you.

THE COURT: Thank you.

**CROSS-EXAMINATION**

BY MR. RANTISI:
Q. Good afternoon, Officer.
A. Afternoon.
Q. What is the Central District of Illinois?
A. I could not tell you.
Q. You just testified that this happened in the Central District of Illinois, so what is it?
A. The district that we're in.
Q. Okay. Do you know where it starts and where it ends?
A. I do not.
Q. Did somebody tell you that we're in the Central District of Illinois?
A. Yes.
Q. Who?
A. Miss Ortiz when I was --
Q. So she told you what to testify to today?
A. She told me which district this occurred.
Q. So you don't have independent knowledge of what the Central District of Illinois is?
A. I do not.
Q. Is there anything else they told you to say today when you came to testify?
A. No.
Q. Now, you just testified that the vehicle

stopped; that is something that's common for cars when they want to let an officer go around them. Do you remember testifying to that?
A. Yes.
Q. So, you're in an unmarked -- semi-marked, excuse me, semi-marked Tahoe, correct?
A. Correct.
Q. And did I hear you right that the lights are on the inside of the vehicle?
A. They are.
Q. So, not visible from the outside?
A. Correct.
Q. Any other markings on this semi-marked Tahoe?
A. No.
Q. And are you wanting the jury to believe that Mr. Helems knew that you were behind him?
MS. ORTIZ: Objection, Your Honor.
THE COURT: Sustained.
BY MR. RANTISI:
Q. And it's your testimony that he -- excuse me, that your lights weren't on until after he pulled over to the curb?
A. That's correct.
Q. When you did a search of the vehicle, of the F-150, did you notice a bunch of tools in the

backseat?
A. I did.
Q. Did you find any drug paraphernalia in the vehicle?
A. I did not.
Q. Did you find any cash?
A. I did not.
MR. RANTISI: Nothing further.
THE COURT: All right. Thank you.
Redirect?

**REDIRECT EXAMINATION**

BY MS. ORTIZ:
Q. Officer Moore, did all these activities that you've testified to occur in Peoria County?
A. They did.
Q. And you're familiar with Peoria County?
A. I am.
Q. Do you recall if you found any gym bags or gym clothes in the back of that F-150?
A. I don't recall if I did.
MS. ORTIZ: All right. No further questions.
MR. RANTISI: Nothing further.
THE COURT: All right. Thank you very much. You may step down. You may be excused.
Call your next witness.

MR. WEIR: Your Honor, the government calls Jeff Stolz.

THE COURT: Step up here, please, all the way up. Raise your right hand.

**(Witness sworn by the clerk.)**

THE COURT: Have a seat here, please. Please keep your voice up.

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

MR. WEIR: Thank you, Your Honor.

**JEFFREY STOLZ,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MR. WEIR:

Q. Sir, will you please state your name and spell your last name for the record?

A. Jeffrey Stolz, S-t-o-l-z.

Q. And what is your current employment status?

A. I am retired currently.

Q. Okay. Where are you retired from?

A. The Pekin Police Department.

Q. And how long did you work for the Pekin Police Department?

A. 28 years.

Q. Did you work anywhere else in law enforcement in that --
A. Yes. I worked for two years at Bradley University Police Department as a patrolman.
Q. As a member of the Pekin Police Department, what various kind of roles did you play?
A. I started as a patrol officer. Then I went to K-9. I had two dogs over a ten-year period. My primary focus during the K-9 years was narcotics enforcement. I then went to Investigations and was a detective for 12 years. Out of the 12 years, ten of those I was assigned as a DEA task force officer.
Q. Okay. As a DEA task force officer, were you required to do any kind of narcotics training or anything to become -- to fill that position?
A. Yes, I had a background of narcotics training just through my patrol work through the ten years of K-9, so I had multiple classes in narcotics enforcement interdiction.
Q. And then did you receive additional training as your career continued?
A. Yes.
Q. On February 11th, 2023, were you a part of the DEA task force?

A. Yes.
Q. Did you become involved in an investigation in the Peoria, Illinois, area on that date?
A. Yes.
Q. How did that happen?
A. I believe on the 10th of February I was contacted by a special agent from Springfield. They advised that Chicago DEA had information on a semi that would be coming into town, I believe initially on the 12th, and then it got bumped up to the 11th.
The information provided was that the semi was going to drop off approximately five kilos to an unknown target in the Peoria area.
We were requested by DEA Chicago to deal with the person that the semi met up while Chicago DEA was going to deal with the semi after they left.
Q. Okay. And so I believe you said originally -- well, let me back up.
All that info that you just relayed came from the Chicago DEA; is that correct?
A. Correct.
Q. And based on that information, did you take steps here to begin an investigation?
A. I -- they requested personnel to assist with

this investigation so I reached out to just a few locals. There's an additional Pekin police officer in the DEA task force. I believe I reached out to Peoria MEG and just said that Chicago DEA needs assistance. Do you have some personnel that would be able to assist us?
Q. And were you in charge of this investigation?
A. I was not.
Q. And February 11th, 2023, was a Saturday, correct?
A. That is correct.
Q. And because of that, did you have to kind of put together a team of whoever was available?
A. As I said, we, you know, just reached out. I reached out to the Pekin task force officer. I believe I reached out to a Peoria MEG supervisor who then reached out to, you know, some of their personnel. Collaborative effort.
Q. And were you looking for officers with specific experience?
A. Yes. When we have something along that line, we look for officers with narcotics experience.
Q. And was there some sort of meeting where this information was told to everyone who was going to be a part of that investigation?

A. Yes. There was a briefing at the Peoria Police Department on the 11th.

Q. Was all the information that you just relayed -- all or most of it tendered during that meeting?

A. Correct.

Q. And what role did you play in the actual investigation that day?

A. I was on outer perimeter, meaning that the target was supposed to initially meet at the Bass Pro Shop in East Peoria. We knew that we had air support from a helicopter so we -- you know, I stayed back, I believe, a couple hundred yards just to provide a perimeter in the area. We let the helicopter do most of the observing.

Q. And did you, in fact, ever see the semi that was the target of this investigation at the Bass Pro Shop?

A. I did. I saw it drive by going to that location.

Q. Did you see the semi relocate to the nearby Wal-Mart at any point?

A. Yes, I was, I believe, a few hundred yards from the Wal-Mart. The semi left the Bass Pro Shop and went to the Wal-Mart; I believe it's on the west side of the building, but I was observing it

through binoculars from my point of view.
Q. And from that point of view, were you able to keep an eye on that semi while it was parked at Wal-Mart?
A. Yes.
Q. Were you able to see the driver?
A. I saw a Hispanic male. He exited the semi. At one point, he put the hood up on the semi. He walked around a few times. Looked like he was getting under the hood. Of course, at times there were vehicles passing by, obstructing my view but appeared that he got in and out of the semi and walked around for a period of -- I believe it was approximately 20 minutes.
Q. And that would just be at the Wal-Mart?
A. Correct.
Q. While you were watching the semi, did you see it move again from that -- its spot at the Wal-Mart parking lot?
A. Yes, I did.
Q. And based on the information that you were receiving at the time, did you then relocate as well?
A. Yes.
Q. And at some point did that semi drive to the

Lowe's in Peoria?
A. That is correct.
Q. Where were you at when you got to the Lowe's -- when the semi got to the Lowe's in Peoria; do you remember?
A. I was several hundred yards away. Direction-wise, I believe I was to the east.
Q. Now, could you see the semi from where you were at in relation to the Lowe's parking lot?
A. I don't believe I could.
Q. Were you listening to information that was being put out over the radio?
A. Yes, the helicopter was providing live updates of what was occurring.
Q. And were you undercover at the time?
A. I was in an unmarked F-150, and, yes, I was wearing blue jeans and a T-shirt.
Q. So were you -- was it ever your role to try and stop any vehicles that might be involved?
A. No.
Q. And at some point did you hear it called out over the radio that a vehicle had met with a semi and then left the area?
A. Yes, I believe it was a dark-colored Ford truck.

Q. What kind of information was being put out at that time over the radio?
A. The helicopter advised that a couple of bags appeared to be transferred from the semi to the Ford truck.
Q. And then did you receive real-time updates as to the position or travel of the truck from there?
A. That is correct.
Q. And do you remember hearing at some point that an item had been thrown out of the truck?
A. Yes.
Q. And do you remember, was a location given for that item?
A. Yes, the 400 block of McClure Street in Peoria.
Q. And what did you do based on that information?
A. I drove to the area and observed a bag -- it was green colored -- in the gutter, like in the street next to the gutter. I parked my vehicle. I opened up the bag and observed what appeared to be kilos of an unknown substance at that time.
At that time, I moved it from the curb to get it out of the street, placed it on a sidewalk. I requested an additional unit to assist.
Q. Okay. And did an additional unit eventually

come to the area?
A. Yes.
MR. WEIR: Your Honor, if I could, I would move to admit and publish Government Exhibit 3.
THE COURT: Is that separate from what we've already seen?
MR. WEIR: It is, Your Honor. These are photos.
THE COURT: All right.
MR. WEIR: Two photos, page one, page two.
THE COURT: That's fine. Go ahead.
BY MR. WEIR:
Q. So this is what's been labeled Government Exhibit 3, page one of two. Do you recognize that?
A. I do.
Q. What is that?
A. It's the green and black bag that I initially located in the street.
Q. Is this where you've relocated that bag to?
A. Correct.
Q. And is that a fair representation of what that bag looked like at that time?
A. That is correct.
Q. And so in that picture, that bag appears to be unzipped. Is that accurate?

A. I believe, yeah, the top left corner, I believe, is --
Q. Did you unzip that bag?
A. I did, yes.
Q. So when you found it, was it zipped?
A. It could have partially been unzipped, but it was mostly zipped up.
MR. WEIR: Can we go ahead to page two, please.
Q. Sir, do you recognize that?
A. I do. Those are the later turned out to be kilos of cocaine that were located inside of the bag.
Q. And based on your training and experience, when you arrived and saw these items, what did you believe them to be?
A. I believed them to be kilo-size quantities of cocaine.
Q. Is that a common packaging for these types of things?
A. Yes.
Q. And, sir, if you can -- I'm not sure if it's clear enough on the screen. Can you see any markings on that -- those items inside that bag?
A. It --

Q. I believe there's a screen --
A. Yes. There's a KF 22.
Q. And in your experience, is it common for narcotics to be labeled in certain ways?
A. Yes.
Q. What are some of the purposes of that?
A. There's a couple different ways. Sometimes it is the signature of the person who the drugs are coming for. You know, certain -- you know, people receive drugs. If they like a particular drug, they want the same batch next time so it could be a signature of whoever they're coming from.
On the other hand, it also can be -- if there's a large shipment going somewhere, it can be to identify who they are going to, the recipient of those drugs.
Q. So, in other words, if there were two different things written on two different bricks like this, one might go to one person, and one might go to another?
A. Correct.
MR. WEIR: And, Your Honor, may I approach the witness?
THE COURT: You may.
MR. WEIR: Miss Hopps, can we go back to page

one?
Q. Sir, I just handed you Government's Exhibit 2. Do you recognize that?
A. I do.
Q. What is it?
A. This is the bag that I located in the gutter of the street, McClure Street.
Q. And if you look at the bag in the picture, you can see rips and things in the top. Does that bag have those same identifying marks?
A. Yes, it does.
Q. And are there other marks on the bag?
A. Yes, there are -- rotating the bag around, there's scuff marks, holes in the bag as if it had slid on a surface.
Q. Otherwise, is that bag in the same or similar condition as the night you found it?
A. Correct.
Q. And, obviously, without the contents, correct?
A. That's correct.
MR. WEIR: Your Honor, I'd move to admit -- I'm sorry. They're already admitted.
THE COURT: They're already.
BY MR. WEIR:
Q. Was that bag and the items inside then

collected and taken to the Peoria Police Department to be processed as evidence?
A. That's correct.
MR. WEIR: No further questions, Your Honor.
THE COURT: All right. Thank you.

**CROSS-EXAMINATION**

BY MR. RANTISI:
Q. All right, Officer. Good afternoon.
A. Good afternoon.
Q. So, you mentioned earlier that your original information on this was that the exchange, the transaction, the deal was going to take place on the 12th, and that turned out to be moved up to the 11th of February; is that right?
A. Correct.
Q. And then your information that you all received was that this was going to be a deal for five kilos of cocaine, and it turned out to be 37?
A. Correct.
Q. The original information was that the transaction was going to take place at the Bass Pro Shop, and it turned out to be at Lowe's in Peoria?
A. Correct.
Q. And you didn't have any information as to who this was going to?

A. Correct.
Q. When surveillance started, you said you couldn't see the semi-truck when it was parked at Bass Pro; is that right?
A. Correct. It drove by me. I believe it took a right through the parking lot.
Q. Okay.
A. But yes, at Bass Pro, I did not have a direct eyesight on it.
Q. So what you just described, is that what it did on its way to Bass Pro Shop?
A. It drove past the Wal-Mart where I was stationed at and then went to the Bass Pro Shop parking lot where a MEG agent had been in the area providing that information along with the helicopter.
Q. So when it's at Bass Pro, you can't see it anymore?
A. Correct.
Q. And you had binoculars, but you still didn't have a direct line of sight, or whatever the reason is, you couldn't see it?
A. That is correct.
Q. When the semi-truck moves to Wal-Mart, you can now see the driver, and this is where you saw him

out and about of the semi-truck?
A. Correct.
Q. Did you ever see him on a phone?
A. Yes.
Q. Okay. About how many times do you think you saw him use his phone?
A. My recollection, I think he was on the phone most of the time. Like -- as I said, he went around the front of the vehicle. He got in the cab a time or two. Obstructed by some passing traffic, but I believe he was there approximately 20 minutes, and for a decent amount of time he was on the phone.
Q. Is he -- does it appear as though he's speaking with somebody, or does it appear as though he's texting or a combination of both?
A. As I recall, I know he was speaking. I don't recall if he was texting as well, but he was manipulating the phone for sure.
Q. Do you know this guy's name?
A. I do not.
Q. You described him as a Hispanic male?
A. Correct.
Q. Have you taken any steps to learn his name?
A. No.

Q. Are you aware that there were two -- well, strike that.

Are you aware that there was a total of three phones between these two individuals when they were arrested?

A. Yes.

Q. Okay. How many did Mr. Helems have?

A. One.

Q. How many did Mr. Reteguin have?

A. Two.

Q. Have you watched the video of the arrest?

A. I have watched it. It has been quite some time, but yes, I have seen it.

Q. One of the phones -- well, can you describe the blue Motorola phone to us?

A. It was a blue Motorola phone. I know it was bent in half or attempted to be bent in half.

Q. So he or somebody at some point tried to break it, somehow it -- I mean, you said broke in half. Was that at a 90-degree angle?

A. Yes, it was about a 90-degree angle is my recollection.

Q. And did you collect that phone?

A. Yes.

Q. What did you do with it?

A. It was -- a special agent task force officer transported it to Springfield to put it in evidence of DEA.
Q. And you actually prepared an application for a search warrant for that phone, correct?
A. Correct, for a forensic extraction.
MR. RANTISI: May I approach?
THE COURT: Go ahead.
BY MR. RANTISI:
Q. Can you flip through that and let me know when you're done? Or if you're done, can you tell us what it is?
A. This is my application and appears to be search warrant for the forensic extraction of the broken Motorola cell phone.
Q. Okay. About how many pages makes up that document?
A. 19, I believe. There's also a couple reports that are --
Q. So this application is your request to get permission to download the contents from this phone; is that correct?
A. Correct.
Q. And when you do these applications, you lay out all the reasons why you need the information;

is that right?
A. Yeah, we lay out enough probable cause to try to complete the extraction.
Q. And you explained in this application what happened in this case, correct?
A. Correct.
Q. You explained basically everything that you discussed today, everything that we've seen on this video, that you're aware of, and you're telling the judge, *This is what happened. This is what we found, and we need an -- we need a search warrant for this phone*?
A. Correct.
Q. And in addition to the reason that you need it, you also explain what you can get from the phone, right?
A. Correct.
Q. Possible contacts?
A. Correct.
Q. Other phone numbers?
A. Correct.
Q. Text communications between maybe buyers and sellers?
A. Correct.
Q. And this is all information that helps you in

your investigation?
A. Correct.
Q. Okay. I'm handing you -- or I handed you Defendant's Exhibit F.
Okay. Do you know what that is?
A. Based on my experience, it looks to be a phone extraction report or, or the contents of a phone extraction report.
Q. Okay. Do you believe that to be the phone extraction report that came back as a result of your search warrant application?
A. I have no idea.
Q. Okay. Was your search warrant, by the way, was it granted?
A. Correct. Yes.
Q. Okay. And you're saying you don't have any idea. Why is that?
A. Well, the phone was damaged and could not be traditionally downloaded by any of our local departments so the phone was sent -- I assume the phone was sent to the DEA lab on the East Coast where they are able to take phones apart and, and basically get into them and then conduct the extraction at that point.
Q. Okay. Have you ever seen the results?

A. I have not, no.
Q. Why not?
A. I was not the case agent on this case.
Q. You submitted the application?
A. Correct.
Q. Okay. And you don't follow up to see if the results come in?
A. I had my own caseload so I assisted with the application because I was there that day and was present during the incident so I had firsthand knowledge of what happened so we, we help each other out on cases and assist each other when we can.
Q. And the first time you saw that exhibit was earlier today, correct?
A. Correct.
Q. Do you remember the date of the application?
A. I believe it was early March. I don't remember the exact date.
Q. Of 2023?
A. Correct.
Q. Did you attempt to get a search warrant for my client's residence?
A. No.
Q. Did you attempt to get a search warrant for

his phone?
A. No.
Q. In fact, his phone was returned to him that night, correct?
A. Correct.
Q. Any time since February 11th, 2023, have you ever surveilled Mr. Helems?
A. No.
Q. You interviewed Mr. Reteguin that evening, correct?
A. Correct.
Q. And you were asking him about the packages that were being thrown out of the passenger side of the vehicle?
A. Correct.
Q. And when you asked him about packages, Reteguin responded and said he didn't know anything about any bags; is that right?
A. That's correct.
Q. And you corrected him and said, *Well, I didn't say anything about any bags*?
A. That's correct.
Q. In looking at the video, are you able to tell, based on body type, the difference between Mr. Helems and Mr. Reteguin?

A. Yes.
Q. And you actually noted that in your report, correct?
A. Correct.
Q. That Mr. Reteguin was bigger than Helems?
A. Correct.
Q. And did Reteguin tell you that he told Helems to let him out of the car?
A. Yes.
MR. RANTISI: I have nothing further.
THE COURT: All right. Thank you.

**REDIRECT EXAMINATION**

BY MR. WEIR:
Q. Sir, you asked Mr. Reteguin about that broken Motorola phone, correct?
A. Correct.
Q. And he said it wasn't his, right?
A. That's correct.
Q. And no one claimed ownership of that phone. Is that accurate?
A. Correct.
Q. So when you wrote the search warrant for the contents of that phone, would that affidavit be discoverable by anyone?
A. No.

Q. Meaning you wouldn't have to turn that affidavit over, correct?
A. Correct. It was -- parties involved said it did not belong to them so it was treated as abandoned property.
Q. So that wouldn't -- the information in that affidavit would not have compromised your investigation. Is that accurate?
A. Correct.
Q. And while you were questioning Mr. Reteguin, Mr. Reteguin said that he didn't know anything about the drugs in the car, correct?
A. Correct.
Q. And he asked -- he said that he -- Mr. Reteguin said that he asked Mr. Helems to pull over and let him out before he fled, correct?
A. Correct.
Q. And then Mr. Reteguin also said that he ran because Mr. Helems ran, correct?
A. Correct.
Q. And essentially the majority of the brief interview with Mr. Reteguin, he blamed everything on Mr. Helems, correct?
A. Correct.
MR. WEIR: Thank you.

I'm sorry, no further questions.

**RECROSS-EXAMINATION**

BY MR. RANTISI:

Q. So, Mr. Reteguin blames everything on Mr. Helems, but the video showed that the bags were coming out of the passenger side, correct?

A. Correct.

Q. And that's the same side that Mr. Reteguin is on?

A. Correct.

MR. RANTISI: Nothing further.

THE COURT: Anything else?

MR. WEIR: No, Your Honor.

THE COURT: All right. Thank you. You may step down.

Do you have another witness?

MS. ORTIZ: Yes. The government calls Albert Holocker to the stand.

THE COURT: All right. If you'd like to stand up and stretch for a minute, please do so.

Step all the way up, please. Raise your right hand to be sworn.

**(Witness sworn by the clerk.)**

THE COURT: Have a seat here, please. Please keep your voice up. Thank you.

**ALBERT HOLOCKER,**

called as a witness, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

BY MS. ORTIZ:

Q. Good afternoon. Could you please state your first and last name for the record?
A. Albert Holocker.
Q. How do you spell your last name?
A. H-o-l-o-c-k-e-r.
Q. And where are you currently employed?
A. Woodford County Sheriff's Office.
Q. And how long have you been there?
A. I've been at the sheriff's office for just over 18 years.
Q. And what's your current job with the sheriff's office right now?
A. I am currently the jail superintendent at the sheriff's office.
Q. Okay. And back on or about February 11th of 2023, what would have been your position?
A. I was a narcotics detective with the sheriff's office assigned to PMEG.
Q. And how long had you held that particular position with PMEG?

A. So I started with PMEG in 2017, worked there for a few years. Came out, back to patrol, and took a sergeant's position and then, for a short time, a general criminal position. And then I went back into the drug unit -- PMEG -- in 2021.
Q. And just briefly, what were your job duties as a detective with PMEG as they relate to narcotics investigations?
A. So, develop narcotics cases, make hand-to-hand purchases from people, surveillance for other agents who are making hand-to-hand purchases, or general surveillance for operations.
Q. And are you familiar with the Peoria and the East Peoria area?
A. I am.
Q. And why is that, sir?
A. Sorry. I grew up in Peoria.
Q. And while with PMEG, did you have occasion to assist the DEA on or about February 11th of 2023?
A. I did.
Q. And what was your role on that day with respect to the assist?
A. In a surveillance role.
Q. And was that in any particular area?
A. In the area of East Peoria and the Bass Pro

Shop or the Wal-Mart/Lowe's area, and then ultimately into Peoria.
Q. All right. And where into Peoria?
A. To the, the Lowe's Home Improvement center in Peoria and then into a neighborhood in the east bluff.
Q. And were you doing anything while surveilling?
A. Monitoring the radio traffic between the other agents and, and the helicopter.
Q. And on February 11th of 2023, were you operating a vehicle?
A. I was.
Q. And just describe for us the vehicle that you were operating.
A. A smaller, compact Nissan Kicks, just a plain car. No outward markings. Just a civilian vehicle.
Q. Did you have a partner that day?
A. I did not.
Q. Were you in uniform that day?
A. No.
Q. Is there a particular reason why you weren't in uniform?
A. In the capacity of working undercover narcotics, I didn't wear a uniform. I wore regular

clothes.
Q. And on that day, what was the reason that you commenced surveillance?
A. We had been informed that there was going to be a potential narcotics delivery in the East Peoria area, I think originally in the Bass Pro Shop parking lot.
Q. Now, you said at one point then you moved to the Peoria Lowe's, correct?
A. Yes. Initially --
Q. Go ahead.
A. I'm sorry. Initially, I think it moved from the Bass Pro parking lot to the Wal-Mart/Lowe's area in East Peoria and then -- and then ultimately to the Lowe's parking lot in Peoria.
Q. Now, why did you move to the Peoria Lowe's?
A. As the information was being developed at the Wal-Mart parking lot in East Peoria, I think it was relayed that the location was going to change to Peoria. I made the assumption that it might go to the Lowe's parking lot since it's a bigger parking lot so I got -- I got out ahead of the surveillance detail and got set up in that parking lot in Lowe's in Peoria.
Q. So when you say you got set up, just describe

what that means.
A. Just parked in a location that was going to be advantageous to where I just assumed that the, the semi might park.
Q. And what did you observe while at the Peoria Lowe's?
A. I saw the semi pull into the parking lot.
Q. And what did it do?
A. It, it parked, and the driver got out.
Q. Okay. Now, did you have binoculars or assisted vision at that point in time?
A. I did.
Q. Okay. And while you were watching the semi-truck parked, what did you see next of interest?
A. I observed a dark-colored Ford F-150 pull up alongside the semi.
Q. And were you able to see what occurred between the semi driver and the pickup?
A. It appeared there was an exchange of something from the semi driver to the, the, the occupant in the truck.
Q. And do you recall how many times there was an exchange?
A. I -- as I recall, I only saw one exchange, but

I, I, I don't recall directly.
Q. Okay. Did you see exactly what was exchanged from where you were?
A. I could not.
Q. Were you able to observe if anyone got out of the F-150 pickup during this exchange?
A. To my recollection, no one got out of the pickup truck.
Q. And do you recall how long you were there observing that interaction between the F-150 and the semi?
A. Just a few minutes.
Q. And then after this exchange, what did you observe?
A. I saw the dark-colored F-150 drive away from the semi towards the, the front of the -- that -- those buildings, the Target and the other shops, and then turn and exit towards the exit of that larger parking lot.
Q. And about what time of day was this?
A. 6:30 p.m.
Q. And what action did you take after that?
A. I let that truck get ahead. I called out the, the direction of travel to the other people in the surveillance detail, and then I gave it enough time

to where it could get out without being conspicuous. And I pulled out behind and exited from a different exit from that same parking lot.

MS. ORTIZ: And at this time I'm going to ask the Court to read the Ashley Douglas stipulation.

THE COURT: Okay. Let me find it here. Ashley Douglas?

MS. ORTIZ: Yes, Your Honor.

THE COURT: Is that correct?

MS. ORTIZ: Yes, sir.

THE COURT: All right. Stipulation of testimony for Ashley Douglas. It's hereby stipulated and agreed by the United States of America, by Gregory M. Gilmore, now United States Attorney for the Central District of Illinois, and the defendant, Jason Helems, that Ashley Douglas is a Lowe's Senior Asset Protection and Safety Manager in Peoria, Illinois. Ms. Douglas provided law enforcement with a copy of video surveillance occurring on February 11, 2023, at the Lowe's parking lot located in Peoria, Illinois, which is marked Government Exhibit 4.

If called to testify, Miss Douglas would state that she was asked by DEA Task Force Officer David Logan on February 15th for a copy of Lowe's

exterior parking lot surveillance video from February 11th, 2023, between the hours of 6 p.m. and 7 p.m.

On February 20th, 2023, she provided DEA TFO Logan with a true and accurate copy.

MS. ORTIZ: Thank you, Judge.

And I'm just going to show you a clip of a video you've previously seen. It's been marked 4A -- call it the Lowe's clip -- from 00 to 2:30, and I would move to publish it.

THE COURT: Go ahead.

MS. ORTIZ: Thank you.

(Whereupon, the video recording was commenced.)

MS. ORTIZ: We're just going to pause it just briefly.

Q. Now, sir, you've just testified that you were conducting surveillance. Are you able to see the location of where you were actually in that parking lot?

A. Yes.

Q. And just what general vicinity were you in?

A. To the top right of the screen.

Q. Okay. And you testified about the F-150 parking up along the semi. Do you see that in 4A?

A. I don't currently see it. I saw it pull in. It's to the -- would be the passenger side of that semi now.
Q. It's in between the two semis?
A. Correct.
Q. Okay.
MS. ORTIZ: We'll just continue. Thank you.
(Whereupon, the video recording was commenced.)
MS. ORTIZ: Okay. We're going to pause it now.
Q. The far right of the screen, do you recognize what that vehicle is that just pulled in?
A. That's the dark -- sorry.
Q. Go ahead.
A. That's the dark F-150 that I was referring to.
Q. Okay.
MS. ORTIZ: Go ahead. We'll continue.
(Whereupon, the video recording was commenced.)
Q. All right. So has the F-150 left the parking lot at this point in time?
A. It did.
MS. ORTIZ: Okay. And I'm going to show you what's been marked as FB, page 1, and move to

publish.

THE COURT: You may.

MS. ORTIZ: Thank you.

What did I say? I meant 4. I'm sorry, 4B.

THE COURT: 4B.

MS. ORTIZ: I meant 4B. Thank you.

BY MS. ORTIZ:

Q. Do you recognize 4B?

A. I do.

Q. And what is it?

A. That's a picture of the overall scene that evening with the F-150 parked what would be two cars directly in front of where I was parked. My undercover vehicle is circled in yellow there.

Q. All right. And that truly, fairly and accurately represents the video that you've just testified about and the scene that you just testified about?

A. That's correct.

Q. All right. And then I'm going to show you page 2 of 4B.

And what does that depict?

A. That's me backing out in the opposite direction of where the F-150 drove away and me backing out of that parking space and getting ready

to pull away.

Q. All right. And that -- that's a true and accurate depiction of what you just testified about?

A. It is.

Q. And let me --

MS. ORTIZ: Okay. We can take it down. Thank you.

Q. Let me just ask you, how soon after the F-150 left the parking lot did you then pull out in your undercover vehicle?

A. Probably about a minute. Less than a minute.

Q. Okay. Is there a reason why you didn't immediately leave the lot?

A. I just -- I didn't want to draw attention to the driver of the F-150, to pull out just immediately after they drove by me.

Q. And where did you go after you left the Lowe's lot?

A. I got out onto War Memorial Drive and then followed loosely as the helicopter had taken surveillance of the, the F-150.

Q. And at some point did you hear radio traffic regarding Peoria police officers attempting to traffic-stop the F-150?

A. I did.
Q. And what was relayed that you recall?
A. As I recall it, they, they were following the F-150 into the neighborhoods off of University, I believe either Loucks or -- I'm sorry, Forrest Hill, in that area, in that neighborhood, and I think in the area of Avalon is where they attempted to make a traffic stop. And then from what I recall, the F-150 fled from that traffic stop.
Q. All right. Do you recall anything else that occurred that made you react?
A. Yeah. So at some point it was relayed from the helicopter that there was packages being thrown out of the, the passenger side of the F-150 into the neighborhoods.
Q. So what action did you take?
A. At that point, I closed the distance on that surveillance. As I drove -- I think it was Forrest Hill, I saw a package in the road with a couple of DEA agents out with that. And I went further, following the path that the F-150 had taken through the neighborhood.
Q. And did you locate anything when you followed the path?
A. I did.

Q. Go ahead.
A. I'm sorry. In front of 215 West Virginia, I found a duffel bag that appeared the contents had been spilled out, was partially in the road in the curb area.
Q. And just describe the contents as you saw it.
A. It was several foil-wrapped, brick-shaped what I knew to be kilos in the -- in the street and on the curb area.
Q. And did this stand out to you?
A. It did.
Q. And why is that?
A. It's not common to find that, that many kilos lying in the street.
Q. And what action did you take there on Virginia?
A. So I, I called out to the rest of the surveillance team that I had located another bag -- or, or the only bag that I had located at that point. I didn't get a response from that surveillance team.
And at that point, there were lights and commotion and the neighborhood starting to come alive from the pursuit that had gone through and then me parked there. At that point, I had no, no

outward markings of being the police or anything like that; I decided to collect that contraband and put it on my floorboard of my car.

Q. All right. Now, did you take a photograph before you collected it?

A. I did not.

Q. Would that be normal practice for you?

A. It is.

Q. And why did you -- didn't you do it with that particular item?

A. I felt -- because of the circumstances I just described, the severity of the situation, I decided just to collect that evidence, not knowing that there was backup coming so I, I didn't take photographs on -- for that bag.

Q. All right. And then what action did you take after you collected that bag and contents?

A. From, from there, I traveled west from that location to the intersection of West Virginia and Bigelow where I observed another duffel bag in a similar condition with the contents partially spilled out of the bag on the road and curb.

At that point, I called out that I was out with that second bag, and I did get a response from my, my backup that they were coming. So from

there, I was confident that I had support and able to slow down and take pictures of the -- of the evidence. And at that point, Director Wilson arrived, DEA TFO Fitzgerald arrived, and I was able to take pictures and then collect that contraband as well.

Q. All right. I'm going to show you what's been marked as Exhibit 7. We're going to go pages one through three. We'll start with page one.

I'll move to publish.

If you could just take a moment to view it.

This is page one of Exhibit 7. Are you familiar with it?

A. I am.

Q. And what is it?

A. It's a picture of that, that second bag that I had -- I had come across with its contents partially spilled in the roadway.

Q. And page two, if we could look at that, of Exhibit 7. What is that a photograph of, sir?

A. It's a broader view of that same piece of evidence.

Q. And then page three of 7.

A. It's just another angle of that same piece of evidence.

Q. All right. Was this photo the one you talked about that was taken by you?
A. Yes.
Q. All right. And approximately how far did you have to travel between the location of where you found the first bag to where you located the second duffel bag?
A. Maybe a half block, three quarters of a block.
Q. And were you able to count how many kilogram-shaped bricks were in each duffel bag?
A. There were 14 in and around each bag so a total of 28.
Q. And was anything further of interest located by you that evening?
A. No.
Q. Were both duffel bags and their contents then turned over to someone by you?
A. They were.
Q. And who was that?
A. From the scene, I drove directly to Peoria Police Department and turned over both items of evidence to DEA TFO Stolz.
Q. And this all occurred in Peoria County, Illinois?
A. It did.

MS. ORTIZ: And may I approach the witness, Your Honor? I'm going to show him what's been marked as Exhibit 5 and 6.

THE COURT: Okay.

BY MS. ORTIZ:

Q. All right. I'm going to hand you collectively Exhibit 5, and then this has got -- this is Exhibit 6. Just take a moment to look at them.

Are you able to identify them?

A. Yes.

Q. And what, what are they?

A. These, these are the duffel bags that had the partial contents that I collected that evening.

Q. All right. And they're in the same or similar condition as when you found them, the bags?

A. They are.

Q. Okay.

A. I apologize. I think the evidence tag came off of 5.

Q. Okay. We'll fix it.

MS. ORTIZ: May I approach again, Your Honor?

THE COURT: You may.

BY MS. ORTIZ:

Q. Do you know if either of those duffel bags were unzipped when you located them in the street?

A. I know the contents had spilled out so I, I didn't check the integrity of the zipper itself.

Q. All right. I'm going to show you --

MS. ORTIZ: And I would move to publish Exhibit 8, the cocaine.

THE COURT: Okay.

MS. ORTIZ: While we're doing that, I would ask that Stipulation 2 as to William Wichert be read, Your Honor.

THE COURT: All right. It's stipulated and agreed by the United States of America, by Gregory Gilmore, now United States Attorney for the Central District of Illinois, and the defendant, Jason Helems, that if called to testify, William Wichert would state that he is a forensic chemist with the Drug Enforcement Administration North Central Laboratory in Chicago, Illinois.

Mr. Wichert examined Government's Exhibit 8 in the course of his employment. During his examination, Mr. Wichert applied all the proper scientific methods and procedures commonly used and accepted in the scientific community relating to the examination of controlled substances.

As a result of his examination, Mr. Wichert determined that the substance contained in

Government's Exhibit 8 contained 37.17 kilograms of cocaine, a Schedule II controlled substance.

MS. ORTIZ: Thank you.

And I would note that Exhibit 8 contains all of the bricks found, 28 plus 9.

And I would just move to pass one brick wrapped and one brick unwrapped to the jurors to be able to view them.

MR. RANTISI: Judge, my only concern is that they're handling drugs without gloves and any protection. That's a safety concern for them, not to mention I don't see the point but --

MS. ORTIZ: I can pass it to them. I can show it to them. It would be so they can feel the --

THE COURT: Stand in front of the jury box and show it to them.

MS. ORTIZ: All right.

THE COURT: There's two types. Is that what you're saying?

MS. ORTIZ: Yes. Well, one is wrapped, and one is -- one is wrapped in foil, and one has been unwrapped, but it's been placed in a plastic bag.

THE COURT: All right. Just stand in front of the jury box and show them. Maybe walk up and down.

MS. ORTIZ: All right.

(Government's Exhibit 8 published.)

THE COURT: All right. Thank you.

MS. ORTIZ: Thank you.

Court's indulgence.

(A pause was had in the record.)

THE COURT: Can you move the last bag off the table, please?

MS. ORTIZ: Yes.

I would tender the witness. No further questions. Thank you.

**CROSS-EXAMINATION**

BY MR. RANTISI:

Q. Good afternoon, Officer.

A. Good afternoon.

Q. So did you testify earlier that you anticipated the semi-truck going to the Lowe's in Peoria?

A. Yes. Initially we got information that the --

Q. Say that again.

A. We initially got information that the exchange would possibly go down in the Lowe's parking lot in East Peoria, so I just made an assumption that -- to go get ahead -- there was plenty of surveillance vehicles. If they lost me, it wouldn't have been a

problem so I made the assumption to go there.
Q. So of all the parking lots in Peoria, you assumed the Lowe's in Peoria just because it was at the Lowe's in East Peoria?
A. Correct.
Q. Wasn't it also at the Wal-Mart in East Peoria?
A. That's correct.
Q. So did you get there before the semi-truck?
A. At the --
Q. At the Lowe's in Peoria. I'm sorry.
A. I did, yes.
Q. You did?
A. Correct.
Q. And then you said that you followed loosely on War Memorial?
A. Correct.
Q. Okay. So the F-150 was -- when it left Lowe's, it went on War Memorial Drive?
A. I, I don't know how it exited from the parking lot, if it took that left and then a right to get onto War Memorial Drive. I know the Peoria officers had more of a closer surveillance, in addition to the helicopter.
Q. Okay. So were you following the F-150 on War Memorial at some point?

A. I would have been several blocks behind. I would not have had visual of the F-150 or the Peoria officers.
Q. And do you think that it -- the F-150 was on War Memorial?
A. As I recall it was, but I don't have direct knowledge of that. I would have been following along in whatever was being relayed from either the ground units or the, the helicopter.
Q. Would it surprise you if I told you that the F-150 never got on War Memorial?
A. No.
Q. But you testified that you followed it on War Memorial?
A. I, I, I remember getting out onto War Memorial.
Q. So this jury is listening to you. You understand that?
A. I do, sir.
Q. Okay. And you testified that you followed loosely on War Memorial Drive, but that's not accurate?
A. No, I didn't say I was following that vehicle directly. I said I was on War Memorial Drive.
Q. You didn't testify that you were following it

on War Memorial Drive?
A. I was following the surveillance detail loosely on War Memorial Drive.
Q. And you don't recall if the bags were zipped or unzipped, either way; you're not sure?
A. No, I don't.
Q. How long were you in the parking lot at Lowe's in Peoria before the semi-truck got there?
A. I don't have a direct recollection. Maybe five, ten minutes. Not an extended period of time.
Q. And how long before the F-150 pulled up?
A. I don't -- I don't have a direct -- again, I don't want -- I'm not trying to be vague, but I don't remember a direct -- probably less than five, ten minutes I'm guessing.
Q. Well, I'm not really interested in you guessing. Are you able to tell us --
THE COURT: Well, just a moment. Don't do that. Okay? Just ask the question.
BY MR. RANTISI:
Q. Are you able to tell us without guessing?
A. No, I'm not, but I assume that there's probably video surveillance from the helicopter to give you an exact moment in time of how much that took.

Q. Did you ever see the driver of the semi-truck outside of the semi-truck when you were at the Lowe's in Peoria?
A. Yes.
Q. Okay. Did you ever see him use his phone?
A. I don't -- I don't directly recall if I did.
Q. Did you have a direct sight on the semi-truck when it was at the Lowe's in East Peoria?
A. I had a -- I had a looser surveillance. I remember seeing him out of the vehicle in East Peoria, and I remember the vehicle parked on what I would assume be the south side of the Wal-Mart, but I, I didn't have a, a more static surveillance position. I kind of moved around from a distance in that parking lot.
Q. Okay. Did you have binoculars or anything with you?
A. I did.
Q. Okay. Did you ever see the driver of the semi-truck when he was in East Peoria -- whether it's the Lowe's or the Wal-Mart or the Bass Pro -- on his phone?
A. I don't have any recollection of, of that.
MR. RANTISI: Nothing further.
THE COURT: Any other questions?

MS. ORTIZ: No. Thank you very much.

THE COURT: All right. Thank you. You may step down.

May I see counsel at the sidebar?

MS. ORTIZ: May the witness be excused, Your Honor?

THE COURT: I'm sorry?

MS. ORTIZ: May he be excused from the trial?

THE COURT: Yes.

(A discussion was held at sidebar off the record per the Court, out of the hearing of the jury.)

THE COURT: Okay. Well, it's been a long day, hmm, and this is tiring work, isn't it? So we're going to stop for the day. We'll begin again tomorrow promptly at 9:00.

You're going to be going home. You're going to be faced with serious temptations to discuss this case. Your family or friends are going to want to know all about it, and you simply cannot have that conversation now, period. When the trial is over, you can discuss it as much or as little as you want, but it's really important not to have those conversations with your family.

It's my -- I believe, based on conferring with

counsel, we will definitely finish the evidence tomorrow, and I expect we'll have closing arguments first thing on Thursday -- yes, Thursday.

Okay. So starting now, you have to have this wall of silence around yourself.

Have a wonderful evening and safe travels. We'll see you tomorrow morning at 9 a.m.

(Whereupon, the jury departed the courtroom.)

THE COURT: So I think with this going to the jury on Thursday morning, we'll do the jury instructions after we stop tomorrow. Is that agreeable?

MR. RANTISI: Yes, Judge.

THE COURT: Okay. And as far as -- I have all the instructions at this point, correct, that you're offering? You're offering the same ones?

MR. RANTISI: Correct. As long as you got the ones I filed in March, correct.

THE COURT: Right. I've got those.

Okay. I'd like us to be here at 8:45 tomorrow in case there's anything we have to talk about before the jury comes in. Okay?

MR. RANTISI: Yes, sir.

THE COURT: Thank you. Maybe ten to 9; I've got an 8:30 matter I have to deal with.

Also, I want you to check with Dan before you leave the courtroom today in terms of what exhibits -- what exhibits have been referred to. We've admitted them all, but you're going to have to -- every exhibit that's been discussed will be sent to the jury room; otherwise, not. Okay?

COURTROOM DEPUTY: Court's adjourned.

(Proceedings concluded at 4:29 p.m.)