E-FILED
Wednesday, 17 June, 2026 11:18:36 AM
Clerk, U.S. District Court, ILCD


UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, )
Plaintiff, )
vs. ) Criminal No. 1:24-10036
JASON HELEMS, et al., )
Defendants. )

TRANSCRIPT OF PROCEEDINGS - VOLUME II
BEFORE THE HONORABLE MICHAEL M. MIHM, and a Jury
JURY TRIAL
JUNE 10, 2026; 8:52 A.M.
PEORIA, ILLINOIS

APPEARANCES:

For the Government: MATTHEW Z. WEIR, ESQUIRE
Asst. United States Attorney
318 South Sixth Street
Springfield, Illinois 62701

MELISSA ORTIZ, ESQUIRE
Asst. United States Attorney
211 Fulton Street, Suite 400
Peoria, Illinois 61602

For the Defendant: SHARBEL A. RANTISI, ESQUIRE
Rantisi Law, LLC
4812 N. Prospect Road
Peoria, Illinois 61616

Jennifer E. Johnson, CSR, RMR, CRR
U.S. District Court Reporter
Central District of Illinois

Proceedings recorded by mechanical stenography; transcript produced by computer

## INDEX


| | PAGE |
|---|---|
| DEFENSE MOTION | 157 |


## EXHIBITS


| | PAGE |
|---|---|
| COURT'S EXHIBIT 1 | 151 |

(Proceedings held in open court, out of the presence of the jury; 8:52 a.m.)

THE COURT: Let me ask government, you said you have three witnesses left? Who are they?

MR. WEIR: Your Honor, we have Sean Johnston --

THE COURT: Stay seated.

MR. WEIR: Oh, yes, sorry.

We have Sean Johnston, Keagan Robinson in both a fact and expert capacity, and then Matheson Wood.

THE COURT: Robinson is the guy with two hats?

MR. WEIR: Correct, Your Honor.

THE COURT: And I know we discussed this leading up to the first trial. There, in fact, I think had been a motion in limine filed by defense counsel about what he could be allowed to testify about. I think we resolved that.

Is there any need to revisit?

MR. WEIR: I don't think so, Your Honor. It was clear what he can and can't say.

THE COURT: Mr. Rantisi, do you have any reason to doubt that?

MR. RANTISI: Your ruling was clear. Whether it was communicated to the witness, that's up to the government.

THE COURT: Right. Well, just be sure that he is well aware of that.

And you get ready to jump up, if necessary.

MR. RANTISI: You got it.

THE COURT: I'm trying to remember, is he going to wear both hats while he's on the stand at the same time, or are you going to re-call him?

MR. WEIR: No, Your Honor, he's going to come in as a fact witness, and then there will be a witness in between.

THE COURT: Okay. That's better. Okay. Very good.

MR. RANTISI: Judge, we do have an issue that's come up.

THE COURT: Go ahead.

MR. RANTISI: So yesterday at about 5:30, I received a Report of Investigation from the government. This is a report that was not previously disclosed to me. It is the case agent's analysis regarding her review of the phone, the Motorola phone, and I think it -- well, frankly, I think it's a violation of *Brady* disclosures. It contains information regarding names of individuals associated with numbers.

THE COURT: Can I see a copy of this?

MR. RANTISI: Yes.

THE COURT: Thank you.

Let me take a minute and look at it. Is this related to that exhibit you showed me yesterday?

MR. RANTISI: Yes.

THE COURT: This report, at the end of it, two pages with some stuff blotted out is dated 9/26/23 so I -- do you have that?

MR. RANTISI: I have it now.

THE COURT: You what?

MR. RANTISI: I have it only as of yesterday.

THE COURT: Well, before we even get to you then, let me start with them.

So why is this being created during trial?

MR. WEIR: Your Honor, this is a summary report prepared by the case agent, Amanda Petersen. The first 12 pages or so are just information from the extraction report that was supplied to Defense. All it does is pull things out of there that have already been turned over.

THE COURT: But why does he get this during the trial? I mean, you've had literally months where this could have been created and conveyed.

MR. WEIR: Because it doesn't pertain to anything that -- in this trial, Your Honor. There

is nothing in here that pertains to the trial of Mr. Helems.

THE COURT: Well, then why is it relevant here?

MR. WEIR: Because we provided it out of an abundance of caution, Your Honor, after it became clear yesterday that Mr. Rantisi was arguing that this phone was never looked at.

At that point, we decided to disclose it because of the argument he made on the exhibit that didn't come in.

THE COURT: Well, when was the phone looked at?

MR. WEIR: The phone was looked at on the date recorded in this, Your Honor.

THE COURT: Last fall?

MR. WEIR: September 26, 2023.

MR. RANTISI: Judge, this is 2023, by the way.

THE COURT: Yeah, I know.

MR. RANTISI: Okay.

THE COURT: So, I'm still having trouble understanding why this is just generated yesterday.

MR. WEIR: It wasn't just generated yesterday, Your Honor. It was disclosed yesterday.

THE COURT: It was disclosed yesterday?

MR. WEIR: Yes.

THE COURT: Why was it only disclosed yesterday?

MR. WEIR: Because there's nothing in the report pertaining to this investigation.

THE COURT: Well, you're losing me. Are you saying that it only had to do with the co-defendant? Is that what you're saying?

MR. WEIR: It did, Your Honor, and the only things that were generated as a result of this report were things that were already disclosed, except for internal connections that are inadmissible for leads that were passed on to other districts -- so, in other words, Your Honor, information in a database that we couldn't use because it's all hearsay but could be used by those jurisdictions that it was passed on to.

THE COURT: Well, discovery often involves things that may or may not be admissible. If they're relevant at all, they're supposed to be turned over, correct?

MR. WEIR: That's correct, Your Honor, but this is not exculpatory. This is not *Brady*. There's nothing in this report that pertains to Mr. Helems' guilt or innocence. It's simply an

association with two numbers --

THE COURT: I'm still struggling with this, but let me hear what Mr. Rantisi has to say.

MR. RANTISI: Judge, I've spent a considerable amount of time laying out our theory and strategy to the jury that this investigation is lacking; that there's not much, if any, corroboration.

And I spent time with Agent Stolz yesterday pointing out that he didn't look at the results of the search warrant that he applied for.

Now I find out that the case agent actually did look at this -- at these results. And now, only because I went down this path, do they think it's important enough to produce to me. So that's number one.

Number two, it absolutely has to do with Jason Helems. This is charged as a conspiracy. Count II charges on an unknown -- beginning on an unknown date and through February 11th that these two defendants conspired with each other. This is the conspiracy. There's communications and -- with people that they know the name of. That's the conspiracy. These are the people.

This is -- this supports our theory that he didn't have anything to do with it, that these

people did.

And she analyzed it. She was able to look into the DEA database and find a name associated with this number which I didn't have until, you know, less than a day ago.

THE COURT: Well, let me ask the government this. Let's say I don't let this in. She's going to testify at some point, right?

MR. WEIR: We don't plan to call her, no.

THE COURT: You don't plan to call her as a witness?

MR. WEIR: No, Your Honor. We did not have the phone report -- the phone extraction in our exhibit list.

THE COURT: I'm sorry. Who's going to introduce this exhibit?

MR. WEIR: I assume Mr. Rantisi. That's why we provided it. The path that he was going down yesterday --

THE COURT: All right. Stop. You're not going to offer this exhibit?

MR. WEIR: No, Your Honor.

THE COURT: Are you going to offer it?

MR. RANTISI: I'm not going to offer the report as an exhibit, but I -- now I'm in a trick

bag here a little bit because I spent some time showing that there was not an investigation on this phone, that nobody looked at the results, and turns out somebody did.

THE COURT: Right. That's why I thought -- that's why I thought she'd be testifying but --

MR. RANTISI: Well, I indicated to the Court yesterday at the end of the day that I planned on calling her.

THE COURT: I see.

MR. RANTISI: And I wonder if now that's part of the reason why, all of a sudden, this report is being produced.

Two things happened yesterday -- my line of questioning with Stolz and the fact that I alerted the Court that I might be calling her just so that I wasn't surprising you with the time frame. And now, all of a sudden, within an hour, I get this report.

The dates in this report are exactly the dates of the conspiracy charge, January and February '23.

THE COURT: So let me ask you this. So what is it you want me to do?

MR. RANTISI: I'm moving for a mistrial.

And let me make one more point.

THE COURT: Yes.

MR. RANTISI: In jury trial number one, the government produced an exhibit of a Santa Muerte figurine -- and I can show the Court to refresh your recollection if you like, but it's basically a skeleton. And their expert, even though he was still testifying as a fact witness, testified that it's common in the drug world. Whatever he said; I'm paraphrasing.

THE COURT: I remember.

MR. RANTISI: So, turns out that this case agent took pictures of both defendants when they were arrested right before their indictment, so a year and a half down the road. She took a picture of a tattoo on Edu Reteguin's forearm that is the same figurine, and they tried to pin that on my client at jury trial number one by saying it was in his car. I mean, Reteguin's not here, but they're bringing it up and providing evidence.

So that's another discovery issue that I didn't raise until now, but I didn't get those until about a week ago, only because we asked.

THE COURT: I'm looking at the first page of this exhibit. Apparently, it's a report by Amanda Petersen, and it's dated September 27th of '23.

When did you receive this?

MR. RANTISI: Your Honor, this is the one I received yesterday, this whole thing. Everything that's in your hand I received yesterday at 5:30.

THE COURT: Well, I thought you said that you had seen the last two pages before that.

MR. RANTISI: No. No, no, no, I'm sorry. Everything in your hand is the same report, and everything that is in your hand is what I received yesterday at 5:30. I had not seen any of this prior to yesterday.

THE COURT: All right. We're going to be in recess.

COURTROOM DEPUTY: Court's in recess.

(Recess at 9:04 to 9:17 a.m.)

(Proceedings held in open court, out of the presence of the jury.)

THE COURT: So now I've had a chance to look at this more carefully.

If I understand correctly, Mr. Rantisi, the first 11 or 12 pages are what's contained in your exhibit, right?

MR. RANTISI: Correct.

THE COURT: Okay. So the real focus is, I think, beginning on page 11 at the bottom where it

contains a summary of numbers -- telephone numbers and then this three-page report that's attached which was created by the agent in September of '23. It talks about various -- well, we don't know because they're blacked out.

Did you get an unredacted version?

MR. RANTISI: No.

THE COURT: Well, there are several references on this page to names that are blacked out. And, in fact, in the bottom portion of it, paragraph seven, it references multiple Cash App transactions. I'm assuming that means money was transferred, although I don't -- I don't know. But there's a space blacked out for several names on here.

The time period that's covered by this is the 11th and the 12th, which is exactly the time period that we're talking about.

So, I'm going to go back to the government and ask you -- I'm just really befuddled. I don't understand why this wasn't turned over. Why wasn't it turned over?

MR. WEIR: Your Honor --

THE COURT: An unredacted version.

MR. WEIR: Your Honor, we met with Mr. Rantisi

to -- this morning to tell him about the unredacted information. The report is an internal intelligence report.

THE COURT: Who cares? Who cares what it's -- what label you put on it?

MR. WEIR: Your Honor --

THE COURT: The question is whether or not it's appropriate discovery.

MR. WEIR: Mr. Rantisi overstates the importance of this report. We do not know who he was talking to. We do not know who these phones belong to.

THE COURT: Well, it looks like there are a bunch of names that are blacked out. Is that -- am I incorrect about that?

MR. WEIR: That -- you're absolutely correct, Your Honor, but that is intelligence from the DEA. That is not evidence. That is someone saying --

THE COURT: I'm not sure why you make that distinction.

MR. WEIR: That is evidence of other targets of other investigations.

THE COURT: Well, there's a conspiracy charge here which talks about these two people and others known and unknown to the grand jury. Perhaps some

of these people were involved in this conspiracy. Perhaps he might have decided, in furtherance of his theory of the case, that he wanted to subpoena one or more of these people.

MR. WEIR: Your Honor, those -- the ties in this case are, again, not concrete. They are not -- they're not actually made. What happens here --

THE COURT: Well, see, the problem I've got with that is that's your assessment, and --

MR. WEIR: No, it's --

THE COURT: -- you may be right, but from where I'm sitting, I don't know how I can say to him, "Well, sorry. This is just intelligence. You're not entitled to that," because it may still be material to his defense.

But let me move to you for a moment. So what is the gravamen of all this anyway? Why is it material to your defense?

MR. RANTISI: Judge, I think it supports what I've been trying to lay out for the jury, that Mr. Helems didn't know what was happening, he --

THE COURT: How does this do that?

MR. RANTISI: Because this shows that other people were involved. They're charging it as a conspiracy.

THE COURT: Okay.

MR. RANTISI: Okay? So there are other co-conspirators; it's just not him. Okay? There are other people involved, and this supports our theory that he didn't know what was going on, that this -- there was phone calls being made. We have evidence that the truck driver's making phone calls; he's on his phone. We know --

THE COURT: Is this the truck driver's phone?

MR. RANTISI: That's what I asked. I don't know. They say no, but --

THE COURT: Whose phone is this? Reteguin's? Whose phone was this?

MR. WEIR: This is the broken phone that Mr. Reteguin dropped on the ground.

THE COURT: Reteguin. Okay.

MR. RANTISI: But he's communicating with people. That could be the truck driver; I'm told it's not, but we don't know because they don't know his name so I don't know how they can make that connection.

The point is that Count II charges a conspiracy, and these are the co-conspirators right here. There's no mention of Helems.

THE COURT: This first page reports the agent

reporting that she sent the phone out west for them to do the forensic examination. It certainly was an exhibit -- or it was a piece of physical evidence seized at the scene of the arrest.

You didn't receive this either until yesterday, page one?

MR. RANTISI: Are you talking about the -- page one? This -- like I said, Judge, everything that's stapled was the report I received yesterday.

MR. WEIR: Your Honor, he received the entire extraction report with the report of the agent that put the phone back together, when they received it, what they did to extract that information, and he received every phone call. He already knew that there were no phone calls to Mr. Helems.

THE COURT: Well, he received the report, but the report itself --

MR. WEIR: No --

THE COURT: I'm sorry, the first 11 pages don't identify anybody by name. It's just numbers.

MR. WEIR: Correct, Your Honor. And again, he had --

THE COURT: Where did these blacked-out names come from? I assume it came --

MR. WEIR: An internal DEA database, Your

Honor.

THE COURT: Well, but I assume that they came from the phone numbers that are listed at the bottom of page 11.

MR. WEIR: That's correct, Your Honor. Miss Petersen -- or Agent Petersen put them into an internal DEA database. When that was put in, it said this phone has been identified in this state to this person.

But all that is is someone telling them, "Hey, this guy uses that phone number."

So it was passed on, and that's the only use of it.

THE COURT: Well, I thought that the -- correct me if I'm wrong. At the bottom of page 11, you have one, two, three, four, five, six, seven called chat participants.

MR. WEIR: Yes, that was taken from the information that was given to Mr. Rantisi.

THE COURT: Right. And so then my question is, taking a look at page 11 with the report that follows it, are the names in that report, do they come from the phone numbers at the bottom of page 11? My guess is they do. Am I correct about that?

MR. WEIR: I'm sorry, Your Honor, if I could

have one second?

THE COURT: Sure.

(A pause was had in the record.)

MR. WEIR: Your Honor, the -- as to paragraph six, the blacked-out information is actually in the extraction report provided in this case. It is --

THE COURT: Their names are in what he received earlier?

MR. WEIR: Correct, Your Honor.

THE COURT: Where is that? Can you direct me to that? Can you show me where that is?

MR. WEIR: His --

THE COURT: You said those names are in what he had received?

MR. WEIR: Oh, Your Honor, this is not the extraction report.

THE COURT: What is it?

MR. WEIR: These are just excerpts from a very large file that was sent. The entire phone file is, is very large.

THE COURT: Okay.

MR. WEIR: So all --

THE COURT: Do the names in the report come from the phone numbers?

MR. WEIR: No, not all of them. And yes --

all right. Let me back up.

THE COURT: Go ahead.

MR. WEIR: The phone numbers identified were plugged into a database that came back with a name associated with that number by the DEA. Two of those numbers.

THE COURT: Where did the rest of them -- where did the rest of these names come from? Because when I'm looking at this, it says, like here, "In the picture of the Cash App transfer to" so and so "a profile is observed."

"SA Petersen compared" somebody "hereafter referred to as" somebody "to the Cash App profile picture."

The Cash App, is that included in these phone calls?

MR. WEIR: Yes.

THE COURT: Okay. All right. I'm sorry. I, I just don't get this. I cannot -- we can't go forward with this trial.

MR. WEIR: Your Honor, this is inadmissible evidence that he can't ask about.

I would also point out that we did not at any time intend to introduce any of this evidence. It was never on the exhibit list until Monday.

THE COURT: But wait, wait. I think you're missing something. You said you never intended to do this, but the discovery process exists so that both sides can look at evidence, assess it, and make decisions on whether they wish to attempt to introduce it during their case. It's for both sides, not just the government.

MR. WEIR: That's correct, Your Honor. And he had all of the information except for two names which is inadmissible and cannot be proven.

THE COURT: Well, there are a lot more names than two in this report. Are you saying that all of these blacked-out areas only involve two people? I don't know because it's blacked out.

MR. WEIR: Your Honor, all of the blacked-out information is not, first of all, are not names. It's personal identifying information such as addresses as well.

But my point being, there is nothing in this report that has anything to do with Mr. Helems or this trial. Mr. -- the --

THE COURT: Mr. Rantisi, do you have any final thoughts?

MR. RANTISI: I mean, I can repeat myself. I don't agree with that. This absolutely has to do

with him. This is a co-defendant, and it's the same time period, and it's the communication that's taking place at the same time of this conspiracy the way it's charged. They decided to charge it with an unknown beginning date through February 11th. This falls within that range, and it's completely relevant.

Mr. Weir doesn't get to decide what's relevant and not relevant.

THE COURT: I mean --

MR. WEIR: Your Honor --

THE COURT: On one hand, I could say, well, you may be stretching this a little bit too much because even if he talked to 15 people about this case, that doesn't -- that doesn't necessarily mean that your client wasn't also involved in that conspiracy.

MR. RANTISI: I appreciate that, but our theory is that he wasn't involved, and they can't tie him to this other than the fact that he was present. That's, that's really all they have and, of course, the fleeing.

There has been no corroboration, and I've said this multiple times. No messages with him. No phone calls with him. No other statements from

other witnesses with his involvement. No possession, you know, at his house. No phone -- no phone dump from his phone, nothing like that.

And here we have names that I can't see, Reteguin's communicating with these people, and it's problematic that I'm getting it in the middle of trial.

MR. WEIR: Your Honor, we don't know and cannot say that he was communicating with anyone, and it would not, again, be admissible. And he knew that these phone calls took place this entire time because he's had them. He knew he was talking to someone, and that's all he could say now even with this report.

MR. RANTISI: That's not true. We have names now. The agent's been sitting on names.

MR. WEIR: Which are not confirmed and cannot be said that that's who they were talking to. It's an internal database based on hearsay and intelligence, Your Honor.

THE COURT: You seem to be -- I mean, you're placing a lot of focus on what would end up being admissible, and again, that's not the test of discovery.

MR. WEIR: It's irrelevant, Your Honor. It

has nothing to do with this case. That's my position.

THE COURT: Well, that's perhaps an argument to be made later, but I'm sorry, I'm going to have to grant a mistrial. I just -- I don't see how I can get around this.

MR. WEIR: It's -- Your Honor, the entire extraction report is inadmissible. I made that argument before he tried to put it in.

THE COURT: I'm sorry.

MR. WEIR: And it didn't come in, just like I said it wouldn't.

THE COURT: We're going to have to have a mistrial.

Do you want to talk now about a new date --

MR. RANTISI: Sure.

THE COURT: -- for a retrial? How far down the line do you want this?

MR. RANTISI: July or August.

THE COURT: Okay. August. Late July or August.

COURTROOM DEPUTY: August 24th?

THE COURT: Anything sooner? That's almost three months.

COURTROOM DEPUTY: July 20th?

THE COURT: How about July 20th?

MR. RANTISI: That would be fine.

THE COURT: All right. So that's a date we've agreed to, and I'm sure there will be things involved in getting ready for the next trial.

The Court finds that the period of time between today and July 20th is excludable time for purposes of the Speedy Trial Act.

Any objections to those findings?

MR. RANTISI: No, Judge.

THE COURT: Does the government have any objection to those findings?

MR. WEIR: No, Your Honor.

THE COURT: All right. With your permission, I'm just going to go to the jury room and talk to the jurors and send them home.

MR. WEIR: Your Honor, can we do the -- do the same thing and have the exhibits returned to the government at this time?

THE COURT: Certainly. Absolutely.

Anything else?

MR. RANTISI: No, sir.

THE COURT: All right.

COURTROOM DEPUTY: Court's adjourned.

(Proceedings concluded at 9:34 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jennifer E. Johnson, CSR, RMR, CBC, CRR, in and for the United States District Court for the Central District of Illinois, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing Volumes I and II are true and correct transcripts of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 17th day of June, 2026.

/s/ Jennifer E. Johnson
JENNIFER E. JOHNSON
CSR, RMR, CBC, CRR
License #084-003039